SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

## Daniel Tumpson, et al. v. James Farina, et al. (A-13/14-13) (072813)

**Argued March 31, 2014 -- Decided July 31, 2014**

**ALBIN, J., writing for a majority of the Court.**

In this appeal, the Court addresses two issues: whether the Clerk of the City of Hoboken violated the referendum provisions of the Faulkner Act by refusing to file a petition and, if so, whether the City Clerk deprived plaintiffs of a substantive statutory right protected by the New Jersey Civil Rights Act, thus entitling them to attorney's fees.

The City of Hoboken is a Faulkner Act municipality and its citizens are empowered to challenge an ordinance in a referendum, provided the challengers file with the city clerk a petition containing signatures of qualified voters numbering at least fifteen percent of the votes cast in the last election of members of the General Assembly. N.J.S.A. 40:69A-185. In February 2011, the Hoboken City Council introduced Ordinance Z-88 to amend the city's rent control code. The ordinance limits the remedies for tenants, living in rent-controlled units, who seek recoupment for rent overcharges. The Council adopted the ordinance and, on March 11, 2011, the mayor approved it. Plaintiff Daniel Tumpson and others formed a Committee of Petitioners to bring a referendum challenge to the ordinance. Tumpson was informed by the Hudson County Clerk's Office that the last General Assembly election was held in 2007 and that 6480 votes were cast in Hoboken. That information was mistaken because the last General Assembly election was held in 2009. Based on the 2007 election tally, the signatures of 972 qualified voters were necessary for a referendum, whereas based on the 2009 tally the required number was either 1967 or 2189. City Clerk James Farina provided plaintiffs, in separate letters, two different tallies for 2009. On March 30, 2011, plaintiffs filed with the City Clerk a referendum petition containing 1442 signatures. The Clerk refused to accept the petition because it lacked the minimum number of signatures based on the 2009 vote count. On April 11, 2011, plaintiffs attempted to file a supplemental petition with an additional 872 signatures. The clerk rejected this supplemental petition on the ground that the twenty-day period to file a referendum petition had passed.

On May 6, 2011, plaintiffs filed an action in lieu of prerogative writ seeking, among other things, an order directing the Clerk to certify the rent-control referendum petition as valid and to suspend Ordinance Z-88 until the referendum was approved or disapproved by the voters. Plaintiffs also sought relief under the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c), for a violation of their statutory right of referendum. On June 14, 2011, the trial court granted plaintiffs partial relief, finding that the Clerk's refusal to accept for filing the referendum petition violated provisions of the Faulkner Act. The court ordered the Clerk to process both the petition and amended petition and to determine their sufficiency in accordance with the applicable statutes. The court did not address the civil-rights claim. The Clerk then determined that the signatures in the original petition and supplemental filing fell short of the required signatures. Plaintiffs submitted additional signatures, bringing the total to 2224, more than the fifteen percent required for the referendum to proceed. The Clerk, however, rejected the referendum petition because the additional signatures were not submitted in a timely manner.

After a tangled path of motions and appeals, the matter was remanded to the trial court for a ruling on plaintiffs' motion to enforce litigants' rights and for a ruling on the civil-rights claim. On August 25, the court ordered the Clerk to certify the petition and enjoined enforcement of the ordinance. On October 24, the trial court granted summary judgment in favor of plaintiffs on their civil-rights claim, finding that defendants Hoboken and the City Clerk "violated Plaintiffs' substantive right under the referendum laws and are therefore liable" under N.J.S.A. 10:6-2(c) of the New Jersey Civil Rights Act. The court also found that plaintiffs were entitled to an award of attorney's fees and costs pursuant to N.J.S.A. 10:6-2(f). On November 8, 2011, the ordinance was submitted to the voters of Hoboken and the voters approved it. Defendants appealed the finding of a civil-rights violation and the award of attorney's fees.

In a published opinion, the Appellate Division affirmed all but the trial court's finding of a civil rights violation. Tumpson v. Farina, 431 N.J. Super. 164 (App. Div. 2013). The appellate panel determined that the

Committee members did not suffer a deprivation of a right because the court provided the ultimate remedy -- the referendum. Accordingly, the award of attorney's fees was vacated. The Supreme Court granted plaintiffs' petition for certification and defendants' cross-petition. 216 N.J. 4 (2013).

**HELD:** The City Clerk violated the right of referendum guaranteed by the Faulkner Act and deprived plaintiffs of a substantive right protected by the Civil Rights Act, thus entitling them to attorney's fees.

1. The Faulkner Act, N.J.S.A. 40:69A-185 to -192, contemplates a two-step process for validating a referendum petition. If the initial petition is found insufficient, then a corrective, supplemental petition may be filed. Failure to attach to the petition the requisite number of signatures is treated no differently under the Faulkner Act than attaching a large number of signatures of unqualified voters. The supplemental petition allows the referendum proponents to file a petition conforming with the statutory scheme, regardless of the reasons that made the initial petition deficient. The municipal clerk does not have the discretion to prevent the filing of a petition based on facial insufficiency. The Hoboken City Clerk violated the Faulkner Act by rejecting plaintiffs' petition. (pp. 14-26)

2. Plaintiffs' claim under the Civil Rights Act must rise or fall on whether the Clerk deprived them of a substantive right. Plaintiffs must prove that (1) "the Constitution or laws of this State" conferred on them a substantive right; (2) the City Clerk deprived them of that right; and (3) the Clerk was "acting under color of law" when he did so. N.J.S.A. 10:6-2(c). The Hoboken City Clerk was clearly acting in his official capacity and therefore under color of law when he rejected plaintiffs' referendum petition. The Court must therefore examine two specific issues: whether "the power of referendum" granted to the people by the Faulkner Act constitutes a substantive right and, if so, whether the City Clerk deprived plaintiffs of that right. (pp. 26-28)

3. Modeled after the analogous Federal Civil Rights Act, 42 U.S.C.A. § 1983, the State Civil Rights Act is intended to provide what Section 1983 does not: a remedy for the violation of substantive rights found in the State Constitution and laws. To determine whether the State Constitution or state law confers a right on a class of individuals, the Court applies the test developed by the United States Supreme Court in Blessing v. Freestone, 520 U.S. 329 (1997). A plaintiff must show that (1) the Legislature intended the statute to "benefit the plaintiff"; (2) "the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) "the statute must unambiguously impose a binding obligation on the States." Id. at 340-41. The Court has no difficulty concluding that the "power of referendum" is a right under that test. First, the Faulkner Act confers a benefit on plaintiffs and the entire class of voters in Hoboken. Second, this is not the enforcement of an amorphous statute that strains judicial competence. Last, the Faulkner Act unmistakably imposes a binding obligation on the Hoboken City Clerk to accept for filing a referendum petition, to certify the petition if it meets the statutory criteria, and to place the challenged ordinance before the voters. In addition, plaintiffs must show that the right is substantive, not procedural. "Substantive" addresses those rights and duties that may give rise to a cause of action. Because the City Clerk's failure to file the referendum petition gave rise to a cause of action, by definition, the right of referendum is substantive in nature. (pp. 28-36)

4. Because plaintiffs have satisfied the three-factor Blessing test and because the right of referendum is substantive, defendants must show that the enforcement of this right under the New Jersey Civil Rights Act is incompatible with the Faulkner Act. Nothing in the broad-based language of the Civil Rights Act remotely suggests that the drafters did not intend its remedies to apply to enforcement of the right of referendum. Indeed, one of the most powerful remedies of the New Jersey Civil Rights Act, the attorney's fees provision of N.J.S.A. 10:6-2(f), makes the two legislative schemes complementary. With that provision, citizens thwarted by official action denying them the benefit of a substantive statutory right have the ability to attract competent counsel and take an appeal directly to the voters who can then approve or reject an ordinance at the polls. The Court concludes that the Faulkner Act confers a substantive right of referendum protected by the New Jersey Civil Rights Act. (pp. 36-40)

5. That the Law Division later provided a judicial remedy by compelling the Clerk to abide by the Faulkner Act and process the referendum petition does not alter the nature of the Clerk's earlier act, which deprived plaintiffs of a statutory right. Moreover, that the Clerk acted in good faith or that no precedential authority had spoken precisely to the facts in this case does not bar equitable relief under the New Jersey Civil Rights Act -- no more than it bars relief

2

under Section 1983 of the federal Civil Rights Act. The City Clerk deprived plaintiffs of their substantive right of referendum when he refused to file their referendum petition and plaintiffs had a right to equitable relief to enforce that right. (pp. 40-48)

The judgment of the Appellate Division is **AFFIRMED IN PART** and **REVERSED IN PART**, and the matter is **REMANDED** to the trial court for further proceedings consistent with the Court's opinion.

**JUSTICE PATTERSON**, **CONCURRING IN PART** and **DISSENTING IN PART**, joined by **JUSTICE LaVECCHIA**, submits that the majority applies the New Jersey Civil Rights Act beyond its intended parameters when it construes a municipality's assertion of a good faith legal position in an area of unsettled law to be a deprivation of plaintiffs' civil rights within the meaning of N.J.S.A. 10:6-2(c).

**CHIEF JUSTICE RABNER, JUSTICE FERNANDEZ-VINA, and JUDGE RODRÍGUEZ (temporarily assigned) join in JUSTICE ALBIN's opinion. JUSTICE PATTERSON filed a separate opinion, concurring in part and dissenting in part, in which JUSTICE LaVECCHIA joins. JUDGE CUFF (temporarily assigned) did not participate.**

DANIEL TUMPSON, RUSSELL
HOOVER, ERIC VOLPE, CHERYL
FALLICK and JOEL HORWITZ,

    Plaintiffs-Appellants
    and Cross-Respondents,

       v.

JAMES FARINA, in his capacity
as HOBOKEN CITY CLERK, and
THE CITY OF HOBOKEN,

    Defendants-Respondents
    and Cross-Appellants,

      and

MILE SQUARE TAXPAYER
ASSOCIATION 2009, INC., GINA
DENARDO, individually and on
behalf of all similarly
situated and 611-613, LLC,
individually and on behalf of
all similarly situated,

    Intervenors-Respondents.


Argued March 31, 2014 – Decided July 31, 2014

On certification to the Superior Court,
Appellate Division, whose opinion is
reported at 431 N.J. Super. 164 (2013).

Renée W. Steinhagen and Flavio L. Komuves
argued the cause for appellants and cross-
respondents (New Jersey Appleseed Public
Interest Law Center, Inc. and Zazzali,
Fagella, Nowak, Kleinbaum & Friedman,
attorneys).

Victor A. Afanador argued the cause for respondents and cross-appellants (Lite DePalma Greenberg, attorneys; Mr. Afanador and Jeffrey A. Shooman, on the briefs).

Sean A. Smith argued the cause for respondents (Brach Eichler, attorneys).

Lawrence S. Lustberg argued the cause for amicus curiae American Civil Liberties Union of New Jersey (Gibbons, attorneys).

Edward W. Purcell, Associate Counsel, argued the cause for amici curiae New Jersey State League of Municipalities and New Jersey Institution of Local Government Attorneys (William J. Kearns, Jr., General Counsel, attorney).

JUSTICE ALBIN delivered the opinion of the Court.

In many municipalities, citizens have the right to put to a popular vote an ordinance passed by a local legislative body. This process -- known as a referendum -- allows voters to have "the final say in approving or rejecting an ordinance at the ballot box."  In re Referendum Petition to Repeal Ordinance 04-75, 192 N.J. 446, 450 (2007).  The right of referendum took root more than a century ago, during the Progressive Era, as a response to the increasing influence that special interests played in the passage of legislation.  To counteract that influence, the right of referendum armed citizens with the power to appeal directly to the democratic process.

In 1911, Governor Woodrow Wilson signed into law the Walsh Act, L. 1911 c. 221, the first New Jersey law conferring the

2

right of referendum.  The Walsh Act extended the right of referendum to citizens in municipalities organized under a commission form of government.  Today, citizens in municipalities organized under the Faulkner Act also possess that valuable right.  N.J.S.A. 40:69A-185 to -192.

In this case, a city clerk in a Faulkner Act municipality refused to accept for filing a petition for referendum on the ground that the petition did not have a sufficient number of qualifying signatures.  Members of a Committee of Petitioners brought an action in lieu of prerogative writ to have the challenged ordinance put on the ballot.  They also brought suit under the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c).

Ultimately, the trial court granted the Committee members the relief they sought, placing the ordinance before the voters and awarding them, as the prevailing party, attorney's fees for the deprivation of a substantive right protected by the Civil Rights Act.

The Appellate Division affirmed all but the trial court's finding of a civil rights violation.  The Appellate Division determined that the Committee members did not suffer a deprivation of a right because the court provided the ultimate remedy -- the referendum.  Accordingly, the award of attorney's fees was vacated.

3

We now hold that the city clerk violated the right of referendum guaranteed by the Faulkner Act. We also hold that the violation of that right deprived the Committee members -- and all of the city's citizens -- of a substantive right protected by the Civil Rights Act. The refusal of the city clerk to accept the filing of the referendum petition constituted the deprivation of a substantive right. The vindication of that right under the Civil Rights Act entitled the Committee members to an award of attorney's fees. We therefore affirm in part and reverse in part the judgment of the Appellate Division.

I.

A.

The facts in this case are not in dispute. In February 2011, the Hoboken City Council introduced Ordinance Z-88 to amend the city's rent control code. The ordinance limits the remedies for tenants, living in rent-controlled units, who seek recoupment for rent overcharges. In particular, under the ordinance, a landlord does not have to answer a tenant's request for the calculation of rent paid more than two years earlier or to refund rent overcharges that occurred more than two years earlier. The Council adopted the ordinance and, on March 11, 2011, the mayor approved it.

The City of Hoboken is a Faulkner Act municipality and its citizens are empowered to challenge an ordinance in a referendum, provided the challengers file with the city clerk a petition containing signatures of qualified voters numbering at least fifteen percent of the votes cast in the last election of members of the General Assembly. N.J.S.A. 40:69A-185.

Daniel Tumpson called the Hudson County Clerk's Office and asked for the "total votes cast in [Hoboken] at the last election" of members of the General Assembly. The County Clerk's Office told him that the last General Assembly election was held in 2007 and that 6480 votes were cast in Hoboken. That information was mistaken because the last General Assembly election was held in November of 2009.

The County Clerk's Office error would have significant consequences. Based on the 2007 election tally, the signatures of 972 qualified voters were necessary for a referendum whereas based on the 2009 election tally, the required number was either 1967 or 2189 qualified signatures. The uncertainty about the 2009 numbers is because the City Clerk, in two separate letters, provided plaintiffs with conflicting figures for the number of votes cast in Hoboken in that election, 13,112 votes (April 1, 2011 letter) and 14,593 votes (July 7, 2011 letter).[1]

---

[1] The Clerk did not explain the discrepancy in his letters.

5

Plaintiffs Daniel Tumpson, Russell Hoover, Eric Volpe, Cheryl Fallick and Joel Horwitz formed a Committee of Petitioners to bring a referendum challenge to Ordinance Z-88. On March 30, 2011, nineteen days after the ordinance was enacted, plaintiffs filed with defendant James Farina, City Clerk of Hoboken, a referendum petition containing 1442 signatures. Plaintiffs relied on the 2007 vote tally. The Clerk refused to accept for filing the referendum petition because it lacked the minimum number of signatures based on the 2009 vote count.

Aware that they had mistakenly relied on the 2007 rather than 2009 election vote count, on April 11, 2011, plaintiffs attempted to file a supplemental petition with an additional 872 signatures. The clerk rejected this supplemental petition on the ground that the twenty-day period to file a referendum petition had passed.

B.

On May 6, 2011, plaintiffs filed an action in lieu of prerogative writ seeking, among other things, an order directing the Clerk to certify the rent-control referendum petition as valid and to suspend Ordinance Z-88 until the referendum was approved or disapproved by the voters. Plaintiffs also sought relief under the New Jersey Civil Rights Act, N.J.S.A. 10:6-

6

2(c), for a violation of their statutory right of referendum.[2] Plaintiffs proceeded by way of an order to show cause.

On June 14, 2011, the trial court granted plaintiffs partial relief, finding that the Clerk's refusal to accept for filing the referendum petition violated provisions of the Faulkner Act. The court maintained that once the petition was delivered to the Clerk, "it became his duty under the provisions of the statute to file" the petition and examine its sufficiency. The court ordered the Clerk to process both the petition and amended petition and to determine their sufficiency in accordance with the applicable statutes. The court also noted that if the Clerk deemed the petition to be insufficient, the statute permitted plaintiffs ten days to amend with a supplemental petition. The court did not address the civil-rights claim.

On July 7, the Clerk forwarded a letter to plaintiffs advising that only 1573 of the signatures on the original petition and supplemental filing were valid, falling short of the 2189 signatures required to certify the petition. The Clerk concluded that because the petition was not valid, the ordinance would not be suspended and the referendum would not go forward.

---

[2] Mile Square Taxpayer Association 2009, Inc., a nonprofit association of property owners of multifamily residences, was granted leave to intervene in the action.

On July 18, plaintiffs submitted an additional 844 signatures to supplement the referendum petition. On July 25, the Clerk determined that 651 of those signatures were valid, bringing the total number of valid signatures from all three submissions to 2224, more than the fifteen percent required for the referendum to proceed. The Clerk, however, rejected the referendum petition because plaintiffs had "not submitted these signatures in a timely manner."

At this point, the procedural history becomes a tangle of motions and appeals on the trial and appellate levels. A blow-by-blow description of the litigants' maneuvers is not necessary for our purposes. Suffice it to say, the matter was remanded to the trial court for a ruling on plaintiffs' motion to enforce litigants' rights and for a ruling on the civil-rights claim. On August 25, the court ordered the Clerk to certify the petition and enjoined enforcement of the ordinance pending a "repeal of the ordinance by [a] vote of the council or approval or disapproval of the ordinance by the voters," quoting N.J.S.A. 40:69A-189. Intervenor Miles Square Taxpayer Association filed a Notice of Appeal and moved for a stay of the trial court's order. The stay was granted by the Appellate Division and then vacated by this Court.

On October 24, the trial court granted summary judgment in favor of plaintiffs on their civil-rights claim. The court

8

found that defendants Hoboken and the City Clerk "violated Plaintiffs' substantive right under the referendum laws and are therefore liable" under N.J.S.A. 10:6-2(c) of the New Jersey Civil Rights Act. The court also found that plaintiffs were entitled to an award of attorney's fees and costs pursuant to N.J.S.A. 10:6-2(f), an amount that was later determined to be $69,564.18.

On November 8, 2011, the ordinance was submitted to the voters of Hoboken. The voters approved the ordinance.

Defendants appealed.

## II.

The Appellate Division identified two issues: whether the Hoboken City Clerk failed to comply with the referendum provisions of the Faulkner Act and, if so, whether that failure constituted a violation of the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2, which allows the prevailing party an award of attorney's fees. Tumpson v. Farina, 431 N.J. Super. 164, 168 (App. Div. 2013).

The appellate panel observed that under the framework of the Faulkner Act, a committee of petitioners is allowed to submit a referendum petition and then, if the petition is defective, to file supplemental papers to amend the petition. Id. at 179. The panel determined that "[a] municipal clerk

9

lacks the discretion to refuse to file a petition, even if the signatures thereon are less than the mandated fifteen percent of qualified voters." Ibid. From its review of the statutory scheme, the panel was "satisfied that the Legislature intended that petitioners, as here, should enjoy the right to amend an insufficient petition for referendum, even if the original petition did not contain signatures from fifteen percent of qualified voters." Id. at 180. For that reason, the panel concluded that the Clerk's "refusal to file the original petition was plainly contrary to [N.J.S.A. 40:69A-187]." Ibid.

Despite this statutory violation, the panel did not find that defendants "deprived" plaintiffs of a substantive statutory right protected by N.J.S.A. 10:6-2(c) of the New Jersey Civil Rights Act. Id. at 182. It reasoned that plaintiffs were "not deprived of [their] right to referendum because the Ordinance was submitted to the voters of Hoboken." Id. at 181. The panel, moreover, did not find that defendants "interfered" with any of plaintiffs' substantive rights by "threats, intimidation or coercion," N.J.S.A. 10:6-2(c), an alternate ground for a civil-rights violation. Id. at 182. Therefore, because plaintiffs were not a prevailing party under the Civil Rights Act, the panel vacated the attorney's fees award. Ibid.

We granted both plaintiffs' petition for certification and defendants' cross-petition. Tumpson v. Farina, 216 N.J. 4

10

(2013). Plaintiffs challenge both the Appellate Division's finding that the City Clerk's rejection of the referendum petition did not constitute a civil-rights violation and its vacation of the award of attorney's fees. Defendants challenge the Appellate Division's conclusion that the City Clerk did not have the authority to refuse for filing a petition that was insufficient on its face. We also granted motions from the American Civil Liberties Union of New Jersey (ACLU), the New Jersey League of Municipalities, and the New Jersey Institution of Local Government Attorneys, to appear as amici curiae.

III.

A.

Plaintiffs essentially argue that, under the reasoning of the Appellate Division, had they not sought injunctive relief to vindicate their right of referendum and to put the ordinance on the ballot, they would have suffered the deprivation of a substantive right under the Civil Rights Act, but because they succeeded in securing judicial relief they are now "perversely penalized" by the denial of attorney's fees. This strained interpretation of the Civil Rights Act, plaintiffs suggest, will not further the goal of encouraging lawyers to undertake cases that will vindicate the rights of clients who otherwise cannot afford the high cost of access to the civil justice system. The

11

award of attorney's fees, plaintiffs maintain, is the inducement to take these difficult and costly cases.

Echoing this position, amicus curiae ACLU insists that the New Jersey Civil Rights Act, like other fee-shifting statutes, is "'designed to attract competent counsel'" to represent "'plaintiffs with bona fide claims'" of "'infringement of statutory rights,'" (quoting Coleman v. Fiore Bros., 113 N.J. 594, 598 (1989)). Here, according to the ACLU, plaintiffs were the prevailing party under N.J.S.A. 10:6-2(f) because they obtained an enforceable judgment on the merits -- a result that would entitle them to attorney's fees under 42 U.S.C.A. § 1983 and § 1988, (citing Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 604, 121 S. Ct. 1835, 1840, 149 L. Ed. 2d 855, 863 (2001)). The ACLU explains that to conclude, as did the Appellate Division, that injunctive relief erased the deprivation that occurred in this case will "eviscerate any claim to attorney's fees under any circumstances." Simply put, the ACLU submits that "[t]he clerk's refusal to place the referendum on the ballot was itself the deprivation of a right" requiring the award of attorney's fees.

B.

Defendants City Clerk and City of Hoboken argue that plaintiffs' claim is moot because plaintiffs received all the

12

judicial relief to which they were entitled -- a vote on the ordinance -- and therefore "the Appellate Division had no warrant to reach out and decide the underlying issues." Defendants also maintain that the Appellate Division erred in its interpretation of N.J.S.A. 40:69A-185 of the Faulkner Act by concluding that the City Clerk did not have the right to reject "a facially defective petition." Defendants urge this Court to give the language of N.J.S.A. 40:69A-185 a "natural reading" that would allow the City Clerk to make the sensible decision to refuse to accept a referendum petition that does not have the minimum number of signatures on the face of the petition. In defendants' view, a facially defective petition should not trigger the referendum process and therefore the Clerk's actions were not "a clear abuse of discretion."

Amici curiae League of Municipalities and Institution of Local Government Attorneys, in a joint brief, urge this Court to narrowly construe the protections of the New Jersey Civil Rights Act, which provides relief to "[a]ny person who has been deprived of . . . any substantive rights . . . secured by the Constitution or laws of this State," N.J.S.A. 10:6-2(c) (emphasis added). They concede that an expansive reading of the Act "would be in line with the federal Civil Rights Act," 42 U.S.C.A. § 1983. They, however, believe that such a reading "is not supported by the Legislative history of [the New Jersey

13

Civil Rights Act]" and would "be detrimental to the municipalities and taxpayers of this State."  They ask this Court to interpret the Act as applying only to the "subset of laws which protect against the deprivation of civil liberties and not the general laws of New Jersey."  In their view, the Faulkner Act "does not create a statutorily enforceable right" under the Civil Rights Act, and "[a]n action in lieu of prerogative writ[] is an enforcement mechanism that displaces the [Act]."

IV.

The Court must address two issues:  whether the City Clerk violated the referendum provisions of the Faulkner Act by refusing to file a petition, which on its face lacked signatures of fifteen percent of the number of voters who cast ballots for members of the General Assembly in Hoboken in 2009, and, if so, whether the City Clerk deprived plaintiffs of a substantive statutory right protected by the New Jersey Civil Rights Act, thus entitling them to attorney's fees.

Defendants initially argue that the issues before this Court are moot because the ordinance challenged in the referendum petition was put to a vote.  The mootness argument fails because plaintiffs still contend that they are entitled to attorney's fees as the prevailing party on their civil-rights

14

claim, see N.J.S.A. 10:6-2(f), despite the placement of the ordinance on the ballot.  See Transamerica Ins. Co. v. Nat'l Roofing, Inc., 108 N.J. 59, 64 (1987) (noting that a matter is moot when there is no issue left to adjudicate).  To succeed as a prevailing party, plaintiffs must show that the right of referendum is a substantive right guaranteed by the Faulkner Act and that they were deprived of that right by the City Clerk in contravention of the Civil Rights Act.  At present, defendants challenge the trial court and Appellate Division's finding of a Faulkner Act violation, and plaintiffs challenge the Appellate Division's finding that they were not deprived of a substantive right under the Civil Rights Act.  Plaintiffs' claim to attorney's fees keeps both issues alive and in controversy, regardless of the vote on the ordinance.

V.

Before discussing the referendum provisions of the Faulkner Act, N.J.S.A. 40:69A-185 to -192, and the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2, a historical perspective of how the right to referendum came into being will inform our analysis.

In 1911, Governor Woodrow Wilson signed into law the Walsh Act, currently N.J.S.A. 40:70-1 to :76-27, the first New Jersey municipal charter law to give voters the power of initiative and

15

referendum. Office of Legislative Services, Background Report: Initiative and Referendum in New Jersey's Counties and Municipalities 4 (Oct. 12, 2007) [hereinafter Initiative and Referendum], available at http://cityofatlantic.files.wordpress.com/2010/01/ir_counties_mu nicipalities.pdf.[3] The Walsh Act not only created a new form of municipal governance, it also permitted a referendum on an ordinance if within ten days of the ordinance's passage "a petition signed by electors of the city equal in number to at least fifteen per centum of the entire vote cast at the last preceding general municipal election be presented to the board of commissions." L. 1911 c. 221 § 15. In calling for the law's passage, Governor Wilson explained that the referendum and its sister provisions, the initiative and recall, were "measures which enable the people to correct the mistake of their Governors." Makes Appeal to Lawmakers, Newark Evening News, Apr. 11, 1911, at 4. Governor Wilson considered the referendum one of "the safeguard[s] of politics. It takes power from the boss and places it in the hands of the people." Burton J. Hendrick, The Initiative and Referendum and How Oregon Got Them, 37 McClure's Magazine 235, 235 (1911). Indeed, despite their attempts, the "machine bosses" in New Jersey were unsuccessful

_____

[3] The New Jersey Constitution does not guarantee a right of referendum.

16

in stripping the referendum, initiative, and recall provisions from the Walsh Act.  Machine Bosses Join to Defeat Commission Act, Trenton Evening Times, Apr. 5, 1911, at 1.

New Jersey's initiative and referendum were the product of a larger movement that had been sweeping the country during the Progressive Era of the late Nineteenth and early Twentieth Centuries.  K.K. DuVivier, Out of the Bottle: The Genie of Direct Democracy, 70 Alb. L. Rev. 1045, 1045 (2007).  Reformers proposed the referendum as a democratic antidote against special-interest control of the legislative process.  Benjamin Parke De Witt, The Progressive Movement 214 (1915).  Indeed, many perceived that "state legislatures were no longer representative of the people, but were under the dominance of political rings and the moneyed interests."  Cyclopedia of American Government 179 (Andrew C. McLaughlin ed., 1914).

In California, for example, the Southern Pacific Railroad Company, at the end of the Nineteenth Century, was accused of "attempting to name and control virtually every candidate for every political office from governor on down."  Spencer C. Olin, Jr., California's Prodigal Sons 2 (1968).  "[T]o wrest control of the political process from private interests," California adopted a constitutional amendment authorizing initiatives and referendums in 1911.  James E. Castello, Comment, The Limits of

17

<u>Popular Sovereignty: Using the Initiative Power to Control Legislative Procedure</u>, 74 <u>Calif. L. Rev.</u> 491, 502–03 (1986). Thus, the referendum in New Jersey, as elsewhere, was deemed "an exercise in democracy . . . affording the people the last word if they choose to take a stand against the wisdom of an ordinance that the government has enacted."  <u>In re Petition for Referendum on City of Trenton Ordinance 09-02</u>, 201 <u>N.J.</u> 349, 352 (2010).

   Between 1911 and 1950, over sixty municipalities, including Hoboken, adopted the commission form of government, giving over forty percent of the State's population the right to petition for a referendum.  State Comm. on Cnty. & Mun. Gov't, <u>Modern Forms of Municipal Government</u> 49–50 (May 1992).  In 1950, the Legislature passed the Faulkner Act, <u>L.</u> 1950, <u>c.</u> 210, which allowed for new forms of municipal governance.  Citizens in municipalities organized under the Faulkner Act, such as Hoboken, are granted the power of referendum and initiative.  <u>N.J.S.A.</u> 40:69A-184, -185.  Through the Walsh Act, the Faulkner Act, and special town charters, a majority of New Jersey's population may now engage in the referendum process, <u>Initiative and Referendum</u>, <u>supra</u>, at 4, allowing citizens "the right to test a challenged ordinance in the crucible of the democratic process," <u>In re Ordinance 04-75</u>, <u>supra</u>, 192 <u>N.J.</u> at 450.

VI.

A.

Our primary role here is one of statutory interpretation, construing various provisions of the Faulkner Act, N.J.S.A. 40:69A-185 to -192, and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c) and (f). Our review of a statutory scheme is de novo; we owe no deference to the interpretative conclusions reached by either the trial court or Appellate Division. Farmers Mut. Fire Ins. Co. v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 215 N.J. 522, 535 (2013).

In construing any statute, we must give words "their ordinary meaning and significance," recognizing that generally the statutory language is "the best indicator of [the Legislature's] intent." DiProspero v. Penn, 183 N.J. 477, 492 (2005) (citations omitted); see also N.J.S.A. 1:1-1 (stating that customarily "words and phrases shall be read and construed with their context, and shall . . . be given their generally accepted meaning"). Each statutory provision must be viewed not in isolation but "in relation to other constituent parts so that a sensible meaning may be given to the whole of the legislative scheme." Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012) (citing Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123, 129 (1987)). We will not presume that the Legislature intended a result different from what is indicated

19

by the plain language or add a qualification to a statute that the Legislature chose to omit.  DiProspero, supra, 183 N.J. at 493.

On the other hand, if a plain reading of the statutory language is ambiguous, suggesting "more than one plausible interpretation," or leads to an absurd result, then we may look to extrinsic evidence, such as legislative history, committee reports, and contemporaneous construction in search of the Legislature's intent.  Id. at 492-93 (citing Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 75 (2004); Hubbard ex rel. Hubbard v. Reed, 168 N.J. 387, 392-93 (2001)).  Last, in keeping with our previous directives, "the referendum statute in the Faulkner Act should be liberally construed" for the purpose of "promot[ing] the 'beneficial effects'" of voter participation. In re Ordinance 04-75, supra, 192 N.J. at 459 (quoting Retz v. Mayor & Council of Saddle Brook, 69 N.J. 563, 571 (1976)).

With those legal principles in mind, we turn to the relevant statutes.

B.

Our first task is to determine whether the City Clerk violated the Faulkner Act, N.J.S.A. 40:69A-185 to -192, by not filing plaintiffs' referendum petition.  If the Clerk violated that Act, our next task is to decide whether the right of referendum is a substantive right under the New Jersey Civil

20

Rights Act, N.J.S.A. 10:6-2(c).  We begin with the relevant provisions of the Faulkner Act.

N.J.S.A. 40:69A-185 provides that the voters of Faulkner Act municipalities shall "have the power of referendum which is the power to approve or reject at the polls any ordinance" passed by the council.  Generally, "[n]o ordinance passed by the municipal council" takes effect before twenty days after its approval.  Ibid.  In this case that approval occurred when the mayor signed the ordinance into law.  Those challenging an ordinance through a referendum petition have two opportunities to garner a sufficient number of lawful signatures to place an ordinance on the ballot.  N.J.S.A. 40:69A-185 to -188.  The first opportunity is during the twenty-day period before the ordinance takes effect.  N.J.S.A. 40:69A-185.  If the initial petition does not have the requisite number of lawful signatures as determined by the municipal clerk, then the challengers have ten days to file a supplemental petition with a sufficient number of lawful signatures to meet the statutory threshold. N.J.S.A. 40:69A-187, -188.

With that overview, we now examine the statutes at issue. If, within the twenty-day grace period before the ordinance takes effect,

> a petition protesting against the passage of
> such ordinance shall be filed with the
> municipal clerk and if the petition shall be

21

signed by a number of the legal voters of the municipality equal in number to at least 15% of the total votes cast in the municipality at the last election at which members of the General Assembly were elected, the ordinance shall be suspended from taking effect until proceedings are had as herein provided.

[N.J.S.A. 40:69A-185 (emphasis added).]

The requirement that the petition "shall be filed with the municipal clerk" imposes on plaintiffs the duty to deliver the documents challenging the ordinance. Nothing in the statute suggests that the City Clerk can refuse to accept the petition for filing. Had the statute's drafters intended a different result, the provision would read that the petition "shall be filed by the municipal clerk." This construction of N.J.S.A. 40:69A-185 conforms with other provisions in the statutory scheme. For example, N.J.S.A. 40:69A-189 provides that "[u]pon the filing of a referendum petition with the municipal clerk, the ordinance shall be suspended until ten days following a finding by the municipal clerk that the petition is insufficient." (Emphasis added). Thus, the filing of the petition with the Clerk triggers an inquiry into the adequacy of the petition.

The requirement that "the petition shall be signed" by the requisite number of "legal voters" based on "the total votes cast in the municipality at the last" General Assembly election

22

necessitates that the Clerk investigate and determine two significant matters. One is the actual number of votes cast in the last General Assembly election. Here, the Hudson County Clerk informed plaintiffs of the wrong election year, and the Hoboken City Clerk provided plaintiffs with two different vote counts for the right election year. The potential that the initial petition might not conform to the dictates of various statutes of the Faulkner Act is one apparent reason that the statutory scheme permits the challengers to file a supplemental petition. That is why the statute provides that "the ordinance shall be suspended until ten days following a finding by the municipal clerk that the petition is insufficient," N.J.S.A. 40:69A-189.

Second, the Clerk also must verify that only "legal voters" placed their signatures on the petition, N.J.S.A. 40:69A-185, and that the petition is in the form prescribed by N.J.S.A. 40:69A-186 to -187. N.J.S.A. 40:69A-187 specifically provides that "[w]ithin twenty days after a petition is filed, the municipal clerk shall determine whether each paper of the petition has a proper statement of the circulator and whether the petition is signed by a sufficient number of qualified voters." That inquiry -- after the filing of the petition -- may lead the Clerk to disallow a certain number of signatures or identify some other defect. The Clerk is required, if he finds

"that the petition is insufficient," to "set forth in [a] certificate the particulars in which it is defective and shall at once notify at least two members of the Committee of the Petitioners of his findings." N.J.S.A. 40:69A-187. The Clerk's deficiency findings may necessitate a supplemental petition, as was evident in this case. See N.J.S.A. 40:69A-186 to -190.

Last, if the Clerk finds that either the initial or supplemental petition "filed with him in accordance with [the Faulkner Act] is sufficient, the clerk shall submit the same to the municipal council without delay." N.J.S.A. 40:69A-190. In that event, the municipal council first has the opportunity "to repeal [the] ordinance as requested by a referendum petition." N.J.S.A. 40:69A-191. If the council fails to do so, "the municipal clerk shall submit the ordinance to the voters." Ibid.

C.

We conclude that the various intersecting statutes contemplate a two-step process for validating a referendum petition. If the initial petition is found insufficient, then a corrective, supplemental petition may be filed. The statutory scheme does not indicate that one kind of deficiency in an initial petition empowers the Clerk to refuse to file the petition and to forgo giving the "particulars in which [the petition] is defective." See N.J.S.A. 40:69A-187. Thus the

24

failure to attach to the petition the requisite number of signatures is treated no differently under the Faulkner Act than attaching to the petition a large number of signatures of unqualified voters. No one suggests that once the requisite number of signatures is appended to the petition that a supplemental petition could not be filed even if many signatures were determined to come from unqualified voters.[4] The committee of petitioners has but one opportunity, for whatever reason, to correct the defects in the petition.

As we have seen in this case, the source of an error may even be a government agency. In this case, the Hudson County Clerk gave plaintiffs the wrong election year from which to make the voter-count calculation. The City Clerk provided plaintiffs, in two separate letters, with conflicting figures on the number of votes cast in Hoboken, and the discrepancy amounted to a difference of more than fourteen hundred votes. The Clerk's second letter indicated that his office had reviewed "Hudson County documents" in determining the number of votes cast in Hoboken. It appears that even vote counts may not be self-evident.

The supplemental petition allows the referendum proponents to file a petition conforming with the statutory scheme,

---

[4] We do not address here a case in which a committee of petitioners has submitted in bad faith a willfully non-compliant petition. That case is not before us.

regardless of the reasons that made the initial petition deficient. When the referendum statutes are read as an integrated whole and liberally construed for the purpose of promoting voter participation, it is clear that the municipal clerk does not have the discretion to prevent the filing of a petition based on facial insufficiency.

We are in agreement with the trial court and Appellate Division: the Hoboken City Clerk violated the terms of the Faulkner Act by rejecting plaintiffs' petition as filed.


VII.

A.

We next must determine whether the City Clerk's refusal to file or certify the referendum petition constitutes a deprivation of "any substantive rights . . . secured by the Constitution or laws of this State," entitling plaintiffs to relief under the New Jersey Civil Rights Act. N.J.S.A. 10:6-2(c). Therefore, we must decide whether the people's "power to approve or reject at the polls any ordinance" through the referendum process, as guaranteed in N.J.S.A. 40:69A-185, is a substantive right protected by N.J.S.A. 10:6-2.

We start, as we must, with the plain language of the relevant provisions of the Civil Rights Act. N.J.S.A. 10:6-2(c) provides:

26

> Any person who has been deprived of . . . any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

In addition to the relief enumerated above, a "court may award the prevailing party reasonable attorney's fees and costs." N.J.S.A. 10:6-2(f).

Although N.J.S.A. 10:6-2(c) provides relief for either the deprivation of a statutory substantive right or the interference with such a right "by threats, intimidation or coercion," no one contends that the Clerk engaged in "threats, intimidation or coercion" in refusing to file the referendum petition. Therefore, plaintiffs cannot look to the interference portion of this statute for relief. Their claim under the Civil Rights Act must rise or fall on whether the Clerk deprived them of a substantive right.

To establish a violation of the Civil Rights Act in this case, plaintiffs must prove that (1) "the Constitution or laws of this State" conferred on them a substantive right; (2) the City Clerk deprived them of that right; and (3) the Clerk was "acting under color of law" when he did so. N.J.S.A. 10:6-2(c). No one disputes that the Clerk was acting in his official

27

capacity and therefore under color of law when he rejected plaintiffs' referendum petition. Therefore, we must examine two specific issues: whether "the power of referendum" granted to the people by the Faulkner Act constitutes a substantive right and, if so, whether the City Clerk deprived plaintiffs of that right.

B.

The Civil Rights Act does not define substantive right, nor is the term self-explanatory. By its very nature, the term is broad in its conception. Although the Act's sparse legislative history sheds little light on the precise meaning of the term, it does give a sense of the intended scope of the Act. The Senate Judiciary Committee Statement appended to the proposed legislation explains that the Civil Rights Act is intended to "provide the citizens of New Jersey with a State remedy for deprivation of or interference with the civil rights of an individual." S. Judiciary Comm. Statement to S. No. 1558, 211th Leg. 1 (May 6, 2004). The Act was expected to fill "potential gaps which may exist under remedies currently provided by New Jersey's 'Law Against Discrimination,' N.J.S.A. 10:5-1 et seq., and the law authorizing a civil cause of action for bias crime victims, N.J.S.A. 2A:53A-21." Ibid.

Defendants maintain that, based on that brief legislative statement, the Act should be limited to civil rights cases

28

involving discrimination.  That interpretation, however, is at complete odds with the broadly worded language of the Act.  If the Legislature intended to limit the substantive rights protected by the Act to only those involving discrimination, it undoubtedly would have said so.  See DiProspero, supra, 183 N.J. at 493.  Moreover, the "gap-filling" could not have been for the purpose of plugging holes in the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, which is a comprehensive statutory scheme providing virtually the same remedies offered by the Civil Rights Act.  Rather, the "gap-filling" language implies that the Legislature intended to expand the remedies already provided to victims of bias and discrimination under LAD to citizens whose other substantive rights were not adequately protected under existing law.

Importantly, the meager legislative history tells us that our State Civil Rights Act is modeled off of the analogous Federal Civil Rights Act, 42 U.S.C.A. § 1983, and is intended to provide what Section 1983 does not:  a remedy for the violation of substantive rights found in our State Constitution and laws. S. Judiciary Comm. Statement to S. No. 1558, supra; Press Release, Office of the Governor, Governor's Statement Upon Signing Assembly Bill 2073 (Sept. 10, 2004).

The interpretation given to parallel provisions of Section 1983 may provide guidance in construing our Civil Rights Act.

29

See Garrison v. Twp. of Middletown, 154 N.J. 282, 289 (1998) (noting that interpretation of California Tort Claims Act may be used as guide in construing similar New Jersey Tort Claims Act provisions).

                              C.

Section 1983, in relevant part, provides that any person who, under color of law, deprives another person "of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C.A. § 1983.  The "prevailing party" in a Section 1983 action may be awarded "a reasonable attorney's fee" as well as costs.  42 U.S.C.A. § 1988(b).

Section 1983 is not itself a source of substantive rights, but rather a vehicle by which rights conferred by the Federal Constitution and federal laws may be vindicated.  Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 617-18, 99 S. Ct. 1905, 1916, 60 L. Ed. 2d 508, 522-23 (1979); Baker v. McCollan, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 2694 n.3, 61 L. Ed. 2d 433, 442 n.3 (1979).  Section 1983 protects against the violation of federal rights, not federal laws.  Blessing v. Freestone, 520 U.S. 329, 340, 117 S. Ct. 1353, 1359, 137 L. Ed. 2d 569, 582 (1997).

A statute does not give rise to a right under Section 1983 unless a plaintiff can satisfy three factors. A plaintiff must show that (1) Congress intended the statute to "benefit the plaintiff"; (2) "the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) "the statute must unambiguously impose a binding obligation on the States." Id. at 340–41, 117 S. Ct. at 1359, 137 L. Ed. 2d at 582 (citations omitted).

"Even if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983." Id. at 341, 117 S. Ct. at 1360, 137 L. Ed. 2d at 582. That is because Congress may "'specifically foreclose[] a remedy under § 1983'" either expressly "or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." Ibid. (citations omitted). Congress's intent is the crucial consideration in determining whether a statute precludes an action under Section 1983. Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 252, 129 S. Ct. 788, 793–94, 172 L. Ed. 2d. 582, 590 (2009).

Significantly, in the three cases in which the United States Supreme Court found that federal statutory schemes precluded claims under Section 1983, "the statutes at issue

31

required plaintiffs to comply with particular procedures and/or to exhaust particular administrative remedies prior to filing suit." Id. at 254, 129 S. Ct. at 795, 172 L. Ed. 2d at 592 (citing Middlesex Cnty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 101 S. Ct. 2615, 69 L. Ed. 2d 435 (1981); Smith v. Robinson, 468 U.S. 992, 104 S. Ct. 3457, 82 L. Ed. 2d 746 (1984); City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 125 S. Ct. 1453, 161 L. Ed. 2d 316 (2005)).

In contrast, in Fitzgerald, supra, the Supreme Court permitted plaintiffs to proceed with a Section 1983 lawsuit alleging gender discrimination in violation of the Fourteenth Amendment's Equal Protection Clause and Title IX, 20 U.S.C.A. § 1681(a), despite available remedies solely under Title IX. 555 U.S. at 248–49, 129 S. Ct. at 792, 172 L. Ed. 2d. at 588. The Court conclude[d] "that Title IX was not meant to be an exclusive mechanism for addressing gender discrimination in schools, or a substitute for § 1983 suits as a means of enforcing constitutional rights." Id. at 258, 129 S. Ct. at 797, 172 L. Ed. 2d at 594. The Court reasoned that the Equal Protection Clause provided "divergent coverage" from Title IX and that Title IX did not present the type of "comprehensive remedial scheme" inimical to a Section 1983 action. Ibid.

D.

32

Our state Civil Rights Act is of recent origin. Although the issues that arise over its interpretation are new to us, we have the benefit of an established line of jurisprudence construing its sister provision, Section 1983. To determine whether our State Constitution or state law confers a substantive right on a class of individuals in any particular case, we will apply the test developed by the United States Supreme Court in Blessing, supra. We find that approach sensible and adaptable to our Civil Rights Act. In accord with the Blessing test, even if we find that a statute confers a right, we still must determine whether the Legislature did not intend remedies of our Civil Rights Act to supplant those of other statutes.

We note two distinct differences between Section 1983 and our Civil Rights Act. First, our Act protects against the deprivation of and interference with "substantive rights, privileges or immunities secured by the Constitution or laws of this State," N.J.S.A. 10:6-2(c) (emphasis added), whereas Section 1983 protects against "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws," 42 U.S.C.A. § 1983 (emphasis added). Thus, Section 1983 provides remedies for the deprivation of both procedural and substantive rights while N.J.S.A. 10:6-2(c) provides remedies

33

only for the violation of substantive rights.  That difference must be entered into the equation in applying the Blessing test.

Second, Section 1983 was the product of the Federal Civil Rights Act of 1871, c. 22, § 1, 17 Stat. 13, 13.  In applying the Blessing test, the United States Supreme Court has analyzed whether Congress intended a statute enacted after 1871 to foreclose the available remedies of Section 1983.  See Fitzgerald, supra, 555 U.S. at 253, 129 S. Ct. at 794, 172 L. Ed. 2d. at 591.  Here, because the New Jersey Civil Rights Act is of recent vintage, we must determine whether the Legislature did not intend N.J.S.A. 10:6-2(c) to provide remedies in addition to those in previously enacted statutes or the common law.

E.

In determining whether the referendum provisions of the Faulkner Act confer a substantive right on plaintiffs, and their third-party beneficiaries (the voters of Hoboken), we will apply the following test:  plaintiffs must establish that (1) the referendum statutes were intended to confer a "benefit" on plaintiffs as a representative class of voters of Hoboken; (2) the statutory right to challenge an ordinance and place it before the voting public is not "so 'vague [or] amorphous' that its enforcement would strain judicial competence"; and (3) the Faulkner Act "unambiguously impose[s] a binding obligation" on

34

Hoboken.  Cf. Blessing, supra, 520 U.S. at 340–41, 117 S. Ct. at 1359, 137 L. Ed. 2d at 582.

Initially, we have no difficulty concluding that the "power of referendum" is a right under that test.  The declaration that "[t]he voters shall also have the power of referendum," N.J.S.A. 40:69A-185, makes clear that the benefit conferred is not only to plaintiffs, but to the entire class of voters in Hoboken.  The right to challenge an ordinance is spelled out in minute detail in N.J.S.A. 40:69A-185 to -196.  Moreover, this is not the enforcement of an amorphous statute that strains judicial competence.  Last, the Faulkner Act unmistakably imposes a binding obligation on the Hoboken City Clerk to accept for filing a referendum petition, N.J.S.A. 40:69A-185, to certify the petition if it meets the statutory criteria, N.J.S.A. 40:69A-187, and to place the challenged ordinance before the voters, N.J.S.A. 40:69A-191.

In addition, plaintiffs must show that the right is substantive, not procedural.  "Substantive" addresses those rights and duties that may give rise to a cause of action, see Brown & Root Indus. Serv. v. Indus. Comm'n, 947 P.2d 671, 675 (Utah 1997), whereas "procedural" addresses "the manner and the means" by which those rights and duties are enforced, Shady Grove Orthopedics Assocs. v. Allstate Ins. Co., 559 U.S. 393, 407, 130 S. Ct. 1431, 1442, 176 L. Ed. 2d 311, 323 (2010).  The

35

City Clerk's failure to file the referendum petition to allow a vote on the ordinance gave rise to a cause of action. Thus, by definition, the right of referendum is substantive in nature.

The only remaining question is whether the Legislature in passing the New Jersey Civil Rights Act either expressly or impliedly did not intend the Act's remedies to apply to long-established actions in lieu of prerogative writ -- mandamus actions -- to compel an official to enforce the Faulkner Act's right of referendum. Because plaintiffs have satisfied the three-factor Blessing test, defendants must now show that the enforcement of rights under the New Jersey Civil Rights Act is incompatible with the Faulkner Act. Defendants have not carried that burden.

Nothing in the broad-based language of the Civil Rights Act remotely suggests that the drafters did not intend its remedies to apply to enforcement of the right of referendum. Had the Legislature intended to carve out this statutory area, presumably the Legislature would have said so. See DiProspero, supra, 183 N.J. at 493. Application of the Civil Rights Act in this case is not in any way antithetical to the goals of the Faulkner Act. Indeed, the attorney's fees provision of the Civil Rights Act makes the two legislative schemes complementary.

36

One of the most powerful remedies of the New Jersey Civil Rights Act is the award of attorney's fees to a prevailing party.  See N.J.S.A. 10:6-2(f).  This fee-shifting provision is a mirror of its federal Section 1988 counterpart.  When Congress enacted Section 1988 to allow a prevailing party to receive an award in a Section 1983 action, it did so because "the private market for legal services failed to provide many victims of civil rights violations with effective access to the judicial process."  Riverside v. Rivera, 477 U.S. 561, 576, 106 S. Ct. 2686, 2695, 91 L. Ed. 2d 466, 481 (1986) (citing H.R. Rep. No. 94-1558, at 3 (1976)).  Congress recognized that those seeking to vindicate their civil rights often "cannot afford to purchase legal services at the rates set by the private market," ibid. (citations omitted), and passed Section 1988 "to ensure that lawyers would be willing to represent persons with legitimate civil rights grievances."  Id. at 578, 106 S. Ct. at 2696, 91 L. Ed. 2d at 482.  Our State Legislature, evidently, had the same motivation in enacting N.J.S.A. 10:6-2(f).

We have spoken of the Legislature's purpose in awarding attorney's fees to successful litigants in cases arising under the Consumer Fraud Act, N.J.S.A. 56:8-1 to -20.  There, the Legislature intended the "counsel-fees provision . . . to provide a financial incentive for members of the bar to become 'private attorneys general,'" thus ensuring that "[t]he poor and

37

powerless benefit from the guiding hand of counsel." Gonzalez v. Wilshire Credit Corp., 207 N.J. 557, 585 (2011) (internal quotation marks omitted) (quoting Lemelledo v. Beneficial Mgmt. Corp., 150 N.J. 255, 268 (1997)).  The Legislature could have had no less a purpose in passing the Civil Rights Act.

In the present case, before passage of the Civil Rights Act, plaintiffs could seek to compel the City Clerk by judicial action to process a referendum through an action in lieu of prerogative writ.  But it might seem unlikely that average citizens looking to participate in the democratic process could afford to litigate to enforce their substantive right of referendum.  Success in such an action usually does not afford money damages.  With the attorney's fees provision of N.J.S.A. 10:6-2(f), citizens thwarted by official action denying them the benefit of a substantive statutory right have the ability to attract competent counsel.

It is true that a municipality's violation of citizens' substantive civil rights will impose some financial burden on it, as suggested by amici curiae League of Municipalities and Institution of Local Government Attorneys.  But that is a policy decision resolved by the Legislature when it passed the Civil Rights Act.

The New Jersey Civil Rights Act was intended to apply to cases, such as this one, where a citizen deprived of a

38

substantive right, could not otherwise afford to retain counsel. In essence, the right of referendum is about enfranchisement, about self-government, and about giving citizens the right to vote on matters of importance to their community.  As earlier described, the referendum took root in an era when citizens protested about the outsized influence of special interests in the legislative process.  As Governor Wilson said around the time of the enactment of New Jersey's first referendum statute: the referendum is one of "'the safeguard[s] of politics,'" Hendrick, supra, at 235; it "'enable[s] the people to correct the mistake of their Governors,'" Makes Appeal to Lawmakers, supra.

The referendum is direct democracy in its purest sense, allowing citizens to take an appeal above the heads of their elected officials and directly to the voters who can then approve or reject an ordinance at the polls.  See In re Trenton Ordinance 09-02, supra, 201 N.J. at 353 (stating that referendum power "is an exercise in democracy that profoundly affects the relationship between the citizens and their government by affording the people the last word if they choose to take a stand against the wisdom of an ordinance that the government has enacted").

In short, we conclude that the Faulkner Act confers a substantive right of referendum protected by the New Jersey Civil Rights Act.

## VIII.

### A.

The final question we must resolve is whether the Hoboken City Clerk deprived plaintiffs of their substantive right of referendum under the Faulkner Act. Defendants contend that because plaintiffs succeeded in compelling the Clerk to process the referendum petition and place the ordinance on the ballot, they were not deprived of their substantive right of referendum. On the other hand, plaintiffs submit that when the Clerk refused to file the petition, the deprivation was complete.

We reject defendants' position for a number of reasons. First, although neither the Civil Rights Act nor its legislative history defines the word "deprivation," it does have a common understanding. Deprive or deprivation has been defined as "[a]n act of taking away," and "[a] withholding of something," Black's Law Dictionary 507 (9th ed. 2009), and "[t]o keep from having or enjoying," Webster's II New College Dictionary 305 (2001). Certainly, before plaintiffs secured judicial relief, the Clerk's refusal to file their referendum petition took away, withheld, and kept plaintiffs from enjoying their right of

40

referendum. That the Law Division later provided a judicial remedy by compelling the Clerk to abide by the Faulkner Act and process the referendum petition does not alter the nature of the Clerk's earlier act, which deprived plaintiffs of a statutory right.

This result is supported by a long line of federal cases in Section 1983 actions. By its very words, Section 1983 implicates only cases involving the deprivation of a plaintiff's statutory or constitutional right. Under Section 1983, federal courts have found that a plaintiff is deprived of a right at the point a government official denies a plaintiff a permit or other authorization to exercise a right, even though judicial relief is later secured and the plaintiff freely exercises the right without any interruption. Judicial relief does not extinguish the earlier deprivation.

For example, when municipal officials in Wichita, Kansas, denied an anti-abortion group a permit to conduct a protest parade, the United States Court of Appeals for the Tenth Circuit found that the plaintiffs were deprived of their First Amendment rights under Section 1983, despite the District Court's entry of an order that allowed the parade to go forward without interruption. Lippoldt v. Cole, 468 F.3d 1204, 1210–11, 1220 (10th Cir. 2006). The Tenth Circuit concluded that the plaintiffs "suffered injury by the alleged abridgement of their

First Amendment rights when the City denied the parade permits."
Id. at 1217. Under those circumstances, the plaintiffs were the prevailing party, entitling them to attorney's fees. Id. at 1222-24. In short, protesters who receive "an injunction to exercise their First Amendment rights at a specific time and place -- say to demonstrate at a Saturday parade" are prevailing parties because they have secured "all the court-ordered relief they need." McQueary v. Conway, 614 F.3d 591, 599 (6th Cir. 2010), cert. denied, 562 U.S. ___ , 131 S. Ct. 927, 178 L. Ed. 2d 752 (2011).

Federal courts in Section 1983 actions apparently do not trouble themselves over whether injunctive relief overturning government action is premised on remedying the deprivation of a right that already occurred or on remedying the anticipated deprivation of a right. See, e.g., People Against Police Violence v. City of Pittsburgh, 520 F.3d 226, 229 (3d Cir. 2008) (holding plaintiffs entitled to attorney's fees in Section 1983 action where district court directed city to provide parade permit and parade occurred as originally planned); Young v. City of Chicago, 202 F.3d 1000, 1000-01 (7th Cir. 2000) (holding plaintiff protestors entitled to attorney's fees in Section 1983 action where district court directed city to allow protest to proceed as planned outside of Democratic National Convention); see also Rogers Grp., Inc. v. City of Fayetteville, 683 F.3d

42

903, 905–06, 911–13 (8th Cir. 2012) (holding plaintiff entitled to attorney's fees in Section 1983 action where district court enjoined ordinance -- before enforcement date -- that would have resulted in unconstitutional taking of property).

The principle established in these federal cases is that a plaintiff is entitled to relief for Section 1983 purposes when a government official blocks access to a right -- e.g., the right to assemble or protest or vote -- before judicial intervention. That a court comes to a plaintiff's rescue does not alter the nature of the earlier governmental deprivation or anticipated deprivation.

The dissent basically asserts that because plaintiffs sought and received immediate judicial relief, plaintiffs lost their right to file a civil-rights action. If we accepted that view, the statute would reward inaction and penalize success. This perverse disincentive is precisely what the Legislature could not have had in mind in encouraging the vindication of a right deprived by a public official. Moreover, the dissent's examples in which a deprivation of a right occurred do not exhaust the myriad scenarios in which a deprivation can occur. Post at ___ (slip op at 8–12).

A plaintiff deprived of a civil right is a prevailing party in a Section 1983 action "when actual relief on the merits of his claim materially alters the legal relationship between the

43

parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." Farrar v. Hobby, 506 U.S. 103, 111-12, 113 S. Ct. 566, 573, 121 L. Ed. 2d 494, 503 (1992). An injunction "will usually satisfy that test." Lefemine v. Wideman, 568 U.S. ___, ___, 133 S. Ct. 9, 11, 184 L. Ed. 2d 313, 316 (2012).

A case that makes this point in a voting-rights setting is Diffenderfer v. Gomez-Colon, 587 F.3d 445 (1st Cir. 2009). In that case, the plaintiffs, a class of English-speaking residents of Puerto Rico, filed a Section 1983 action challenging a decision of the Electoral Commission of Puerto Rico to print ballots only in Spanish for the November 2008 election. Id. at 449. The federal district court held that "relief was warranted on the grounds that the Commission's balloting policy violated the Voting Rights Act, the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment." Ibid. Accordingly, the district court issued an "injunction directing the Commission to immediately begin printing bilingual ballots for use in the November 2008 elections." Ibid. Afterward, before appeals were heard challenging the district court's ruling, Puerto Rico enacted a law mandating bilingual ballots. Id. at 450. Nevertheless, the United States Court of Appeals for the First Circuit declared the plaintiffs the prevailing party for attorney's fees purposes because they "obtained the

44

desired practical outcome of their suit through the operation of that injunction:  the Commission in fact distributed bilingual ballots," regardless of the intervening legislation.  Id. at 454.  In other words, the plaintiffs "managed to obtain a favorable, material alteration in the legal relationship between the parties prior to the intervening act of mootness."  Id. at 453.

In the present case, the trial court's grant of relief -- ordering the City Clerk to process the referendum petition -- constituted a relief on the merits "modifying [defendants'] behavior in a way that directly benefits the plaintiff."  Cf. Farrar, supra, 506 U.S. at 111-12, 113 S. Ct. at 573, 121 L. Ed. 2d at 503.  Before the court's ruling, plaintiffs were unable to place the ordinance on the ballot; after the ruling, Hoboken was required to proceed with the referendum in the next election.

Moreover, we are not reading out of N.J.S.A. 10:6-2(c), as the dissent claims, the "interference" portion of the statute. Post at ___ (slip op. at 14-15).  Placing obstacles or hindering the exercise of a right -- without blocking the right -- constitutes an interference.  For instance, those acting under color of law who threaten or intimidate voters have violated the New Jersey Civil Rights Act, even if those voters have exercised their franchise by casting ballots.  We need not, in this

opinion, sketch the various scenarios that would constitute interference in violation of the Civil Rights Act.

                              B.

We also reject the dissent's claim that because "there was no precedential authority" that spoke precisely to the facts in this case and because the City Clerk presumably acted in "good faith," plaintiffs are not entitled to relief under the New Jersey Civil Rights Act. Post at ___ (slip op. at 4). Stripped to its essence, the dissent is suggesting that injunctive relief is barred by qualified immunity. Under Section 1983, when a statutory or constitutional right is violated, a plaintiff is entitled to injunctive relief even if the right was not "sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right," Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523, 531 (1987). See, e.g., Wood v. Strickland, 420 U.S. 308, 314 n.6, 95 S. Ct. 992, 997 n.6, 43 L. Ed. 2d 214, 221 n.6 (1975) ("[I]mmunity from damages does not ordinarily bar equitable relief as well."), abrogated in part on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 817-18, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396, 410 (1982); Hill v. Borough of Kutztown, 455 F.3d 225, 244 (3d Cir. 2006) ("[T]he defense of qualified immunity is available only for damages claims -- not for claims requesting prospective injunctive relief."); Gormley v. Wood-El,

                              46

___ N.J. ___, ___ (2014) (slip op. at 51) ("[Q]ualified immunity does not bar actions for injunctive relief."). In cases in which the right is not sufficiently clear, however, the plaintiff may not secure money damages from a government official. See Harlow, supra, 457 U.S. at 818, 102 S. Ct. at 2738, 73 L. Ed. 2d at 410 ("[G]overnment officials . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights . . . ." (citations omitted)).

That the Clerk acted in good faith or that a court had not previously addressed the specific facts in this case does not bar equitable relief under the New Jersey Civil Rights Act -- no more than it bars relief under Section 1983. Had plaintiffs instituted a lawsuit for money damages against the City Clerk, as opposed to seeking an action for injunctive relief, we would be dealing with a different question. Here, plaintiffs had a right to equitable relief to enforce the right of referendum.

C.

In summary, plaintiffs are deprived of a substantive right protected by the New Jersey Civil Rights Act when a defendant acting under color of law completely prevents them from exercising that right. Before plaintiffs secured judicial relief, the City Clerk prevented plaintiffs from enjoying their right of referendum. Securing judicial relief does not erase

47

the earlier act of deprivation.  We hold that the City Clerk deprived plaintiffs of their substantive right of referendum when he refused to file their referendum petition.

IX.

For the reasons explained, we affirm the judgment of the Appellate Division upholding the trial court's finding that defendants violated the Faulkner Act.  We reverse that part of the Appellate Division's judgment overruling the trial court's finding that plaintiffs were deprived of a substantive right guaranteed by the New Jersey Civil Rights Act and vacating the trial court's award of attorney's fees to plaintiffs.  We remand to the trial court for proceedings consistent with this opinion.

CHIEF JUSTICE RABNER, JUSTICE FERNANDEZ-VINA, and JUDGE RODRÍGUEZ (temporarily assigned) join in JUSTICE ALBIN's opinion.  JUSTICE PATTERSON filed a separate opinion, concurring in part and dissenting in part, in which JUSTICE LaVECCHIA joins.  JUDGE CUFF (temporarily assigned) did not participate.

DANIEL TUMPSON, RUSSELL
HOOVER, ERIC VOLPE, CHERYL
FALLICK and JOEL HORWITZ,

    Plaintiffs-Appellants
    and Cross-Respondents,

        v.

JAMES FARINA, in his capacity
as HOBOKEN CITY CLERK, and
THE CITY OF HOBOKEN,

    Defendants-Respondents
    and Cross-Appellants,

        and

MILE SQUARE TAXPAYER
ASSOCIATION 2009, INC., GINA
DENARDO, individually and on
behalf of all similarly
situated and 611-613, LLC,
Individually and on behalf of
all similarly situated,

    Intervenors-Respondents.

    JUSTICE PATTERSON, concurring in part and dissenting in part.

    The majority holds today that the City Clerk of the City of Hoboken did not properly apply the Faulkner Act, N.J.S.A. 40:69A-185 to -192, when he refused to file the petition submitted by the challengers to Ordinance Z-88, and that the Clerk's action deprived plaintiffs of their rights under that

1

Act, in violation of N.J.S.A. 10:6-2(c) of the New Jersey Civil Rights Act (NJCRA). I concur with the majority that if the City of Hoboken interfered with plaintiffs' due process right of referendum with respect to the disputed ordinance, or attempted to do so, it did not do so "by threats, intimidation or coercion" within the meaning of N.J.S.A. 10:6-2(c), and that plaintiffs accordingly have not presented an interference or attempted interference claim under the NJCRA. Ante at ___ (slip op. at 27). I disagree with the holding of the majority, however, that the City's actions in this case rose to the level of a deprivation of plaintiffs' civil rights under N.J.S.A. 10:6-2(c). Ante at ___ (slip op. at 40).

My conclusion is rooted in the nature of the parties' underlying dispute. In its opinion today, the majority provides significant guidance to municipal clerks in Faulkner Act municipalities when confronted with facially deficient petitions that do not include the required number of signatures. Ante at ___ (slip op. at 22-24). In the future, municipal clerks will be on notice of the procedure to be followed when such petitions are presented for filing.

Until the ruling of the Appellate Division panel in this case, however, there was no such guidance. When the Hoboken Municipal Clerk reviewed plaintiffs' petition, there was no authority in our case law defining the procedure to be followed

2

when a petition lacking the number of signatures required by the Faulkner Act was presented. See N.J.S.A. 40:69A-185 (stating that "the petition shall be signed by a number of the legal voters of the municipality equal in number to at least 15% of the total votes cast in the municipality at the last election at which members of the General Assembly were elected").

Prior case law regarding the adequacy of petitions under the Faulkner Act addressed issues different from that presented by plaintiffs' petition: the petitioners' compliance with the requirement that "the names and addresses of five voters, designated as the Committee of the Petitioners" "appear on each petition paper," pursuant to N.J.S.A. 40:69A-186, or the methods by which municipal clerks should determine "whether the petition [was] signed by a sufficient number of qualified voters," pursuant to N.J.S.A. 40:69A-187. See Hamilton Twp. Taxpayer's Ass'n v. Warwick, 180 N.J. Super. 243, 244-45, 248 (App. Div.) (upholding municipal clerk's rescission of his prior certification of petition signed by requisite number of voters because he found that "the separate petition sheets omitted the names and addresses of the five-member Committee of the Petitioners at the time the voters affixed their signatures"), certif. denied, 88 N.J. 490 (1981); D'Ascensio v. Benjamin, 142 N.J. Super. 52, 55 (App. Div.) (rejecting trial court's specified methods to tally signatures, and authorizing municipal

3

clerk "to adopt any rational means of performing [that] duty, subject to judicial review" under abuse of discretion standard), certif. denied, 71 N.J. 526 (1976); Lindquist v. Lee, 34 N.J. Super. 576, 577, 581-82 (App. Div. 1955) (upholding municipal clerk's decision that petition was insufficient, even though it "contain[ed] a sufficient number of signers," because it did not show "[t]he names and addresses of the five voters designated as the Committee of the Petitioners . . . on each of the petition papers as required by law"); see also Pappas v. Malone, 36 N.J. 1, 6 (1961) (noting that "in view of the overall uncertainties in the statute and the substantial public interest involved we are not disposed to invalidate the clerk's rejection for his failure to meet the requirement of specificity"). In these settings in which the petitions clearly included the minimum number of signatures required by N.J.S.A. 40:69A-185, appellate decisions nonetheless afforded to municipal clerks broad discretion to apply the technical requirements of the Faulkner Act. Accordingly, prior to this case, there was no precedential authority that stated precisely how a municipal clerk should process a Faulkner Act petition with a number of signatures that fell facially short of the statutory mark.

Accordingly, when the City of Hoboken invoked the technical requirements of the Act to reject plaintiffs' patently deficient petitions, it asserted a good faith legal argument in an area of

4

law in which case law provided little guidance.  As the majority recounts, plaintiffs' construction of the Faulkner Act prevailed.  In a ruling that would withstand appellate review, the trial court held that the Clerk's actions had been arbitrary and capricious, and ordered him to process and review the original and supplemental petitions filed by plaintiffs.

In the wake of these developments, plaintiffs achieved their objective.  On the City of Hoboken ballot for the November 8, 2011 general election, the referendum to repeal the disputed ordinance appeared as Public Question No. 2.  Although the voters rejected plaintiffs' challenge to the ordinance, the right of referendum created by the Faulkner Act was afforded to plaintiffs and all Hoboken citizens in the very election that plaintiffs had identified in their petition.  I respectfully submit that, at most, the position taken by the Municipal Clerk triggered an interference, or attempted interference, with the Faulkner Act right of referendum.  I cannot join the majority's holding that plaintiffs suffered a deprivation of that right under N.J.S.A. 10:6-2(c).[1]

_____

[1] The majority depicts this conclusion to be a contention that qualified immunity should bar injunctive relief in this case. Ante at ___ (slip op at 46-47).  That characterization is incorrect; I offer no such argument. Instead, I part company with the majority's conclusion that the conduct at issue in this case constitutes a "deprivation" under N.J.S.A. 10:6-2(c).

The meaning of a deprivation of a right is illustrated by decisions applying 42 U.S.C.A. § 1983, which, unlike the NJCRA, does not address an "interference" or "attempted interference" claim. Federal courts, for example, have consistently found a deprivation of a procedural due process right when a defendant improperly causes an actual loss of that right, as opposed to a delay or a temporary obstruction of its exercise. In Carey v. Piphus, the United States Supreme Court held that two students suspended from public schools without an adjudicatory hearing had sustained a deprivation of their right to procedural due process, warranting an award of nominal damages under 42 U.S.C.A. § 1983, regardless of the ultimate outcome of the case. 435 U.S. 247, 266-67, 98 S. Ct. 1042, 1053-54, 55 L. Ed. 252, 266-67 (1978). The Supreme Court noted that the hearings to which the plaintiffs were entitled did not occur, and that even if their "suspensions were justified, and even if they did not suffer any other actual injury, the fact remains that they were deprived of their right to procedural due process." Ibid.; see also J.A. v. Bd. of Educ. for S. Orange & Maplewood, 318 N.J. Super. 512, 524 (App. Div. 1999) (finding that by "excluding [a student] from its high school without informing her of the grounds of its decision, the South Orange-Maplewood Board of Education violated the due process rights guaranteed to

6

[that student] by the Fourteenth Amendment of the Federal Constitution").

Similarly, in Burch v. Apalachee Cmty. Mental Health Servs., Inc., the plaintiff's five-month involuntary commitment during which he was "never . . . accorded a hearing at which to challenge his commitment and treatment" was sufficient to "state a procedural due process claim upon which relief could be granted" under 42 U.S.C.A. § 1983. 840 F.2d 797, 799, 803 (11th Cir. 1988), aff'd, Zinermon v. Burch, 494 U.S. 113, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990). A former college president whose employment was terminated with no adjudicatory hearing was held to have a cognizable claim under 42 U.S.C.A. § 1983 for deprivation of his right to procedural due process in Hostrop v. Bd. of Junior Coll. Dist. No. 515, 523 F.2d 569, 572, 575-76 (7th Cir. 1975), cert. denied, 425 U.S. 963, 96 S. Ct. 1748, 48 L. Ed. 2d 208 (1976). See also Fetner v. City of Roanoke, 813 F.2d 1183, 1185-86 (11th Cir. 1987) (finding that dismissal of police chief without pretermination hearing raised valid procedural due process claim under 42 U.S.C.A. § 1983); Enter. Fire Fighters' Ass'n v. Watson, 869 F. Supp. 1532, 1541 (M.D. Ala. 1994) (finding that firefighter's procedural due process rights were violated when he was terminated without being afforded pretermination hearing).

7

In each of these cases, the plaintiff identified a procedural due process right to a hearing before action could be taken against him or her, and the defendant, clearly contravening the required procedure, did not hold the requisite hearing. These litigants were not simply subjected to delay, inconvenience, or the expense of bringing suit to resolve a close question of law. Each plaintiff was unjustifiably denied the right to defend him or herself at an adjudicatory hearing, thus supporting a claim under 42 U.S.C.A. § 1983 for a deprivation of that right.

New Jersey and federal courts applying 42 U.S.C.A. § 1983 also have recognized deprivation claims in a range of settings in which the plaintiff has been denied an identified right. In Endress v. Brookdale Cmty. Coll., the Appellate Division found a deprivation of the plaintiff's First Amendment rights when she was terminated from her employment as a college professor in retaliation for writing a newspaper article critical of her employer. 144 N.J. Super. 109, 118-19, 137 (App. Div. 1976). In another First Amendment case, the court found that Cinevision Corporation, a concert promoter, "successfully brought a constitutional claim under 42 [U.S.C.A.] § 1983" because "the City of Burbank violated Cinevision's [F]irst [A]mendment rights by disapproving Cinevision's proposed concerts on the basis of the content of the performer's expression and other arbitrary

factors." Cinevision Corp. v. Burbank, 745 F.2d 560, 581 (9th Cir. 1984), cert. denied, 471 U.S. 1054, 105 S. Ct. 2115, 85 L. Ed. 2d 480 (1985). In Bung's Bar & Grille, Inc. v. Twp. Council of Florence, the court recognized a deprivation claim rooted in the government's assessments against the plaintiffs' property, in violation of the Fourteenth Amendment to the Federal Constitution and of Article I, Paragraph 1 of the New Jersey Constitution. 206 N.J. Super. 432, 457 (Law Div. 1985).

Police use of excessive force has been held in several cases to constitute a deprivation of the plaintiffs' Fourth Amendment rights under 42 U.S.C.A. § 1983. See, e.g., Thomas v. Frederick, 766 F. Supp. 540, 553-55 (W.D. La. 1991) (finding that police officer deprived plaintiff of her Fourth Amendment rights by violently throwing her against his car, causing her to suffer severe back injury, when plaintiff "was unarmed and made no aggressive move which would have justified [the officer's] actions"); Mikulec v. Town of Cheektowage, 909 F. Supp. 2d 214, 219-21 (W.D.N.Y. 2012) (denying defendant police officers' motion for summary judgment on plaintiff's Fourth Amendment excessive force claim because officers apparently "smashed" plaintiff's face into patrol car and violently threw him into patrol car while plaintiff was handcuffed); M.D. v. Smith, 504 F. Supp. 2d 1238, 1248-49, 1254 (M.D. Ala. 2007) (denying defendant police officer's motion for summary judgment on

9

plaintiff's Fourth Amendment excessive force claim because officer slammed plaintiff's head "into the car with force sufficient to cause [plaintiff's] head to dent the car" when plaintiff's conduct did not suggest that he posed any risk to officer). In each of these settings, the plaintiff did not merely experience delay or confront obstacles as the parties' legal rights were determined by a court, but was subjected to a complete denial of that right.

To the majority, the fact that plaintiffs were compelled to resort to litigation in order to ensure a vote on the repeal of the challenged ordinance means that they suffered a deprivation of their rights under the Faulkner Act. Ante at ___ (slip op. at 40-43). The majority relies on cases in which a governmental entity indisputably -- in some cases admittedly -- violated a statute, ordinance or constitutional provision in seeking to bar the plaintiffs' activity. In Lippoldt v. Cole, the defendant City of Wichita conceded that it had denied the plaintiffs' application for a parade permit notwithstanding the fact that its parade ordinance mandated the grant of that permit. 468 F.3d 1204, 1210 (10th Cir. 2006). Similarly, in People Against Police Violence v. City of Pittsburgh, although the City of Pittsburgh immediately abandoned its defense of an ordinance that, among other requirements, compelled individuals seeking to engage in expressive activity in public forums to prepay the

10

City's police costs associated with that activity, the City did not repeal that ordinance or substitute a constitutional alternative in its stead. 520 F.3d 226, 229 (3d Cir. 2008). Accordingly, the District Court issued an injunction in plaintiffs' favor, which the City did not challenge on appeal. Id. at 230. The Third Circuit affirmed the District Court's holding that plaintiffs were "prevailing parties" under 42 U.S.C.A. § 1988. Id. at 228-29.

In Young v. City of Chicago, the Seventh Circuit addressed issues stemming from a District Court's decision to enjoin the City of Chicago's ban on all protests within a perimeter around the site of the 1996 Democratic National Convention. 202 F.3d 1000, 1000-01 (7th Cir. 2000). The City waited until after the convention was over to seek appellate review, and argued that since the First Amendment issue was moot, it should not be liable under 42 U.S.C.A. § 1988 for attorneys' fees. Ibid. The Seventh Circuit disagreed, and affirmed the District Court's award of fees. Id. at 1000-01.[2]

---

[2] McQueary v. Conway, 614 F.3d 591 (6th Cir. 2010), cert. denied, 562 U.S. ___, 131 S. Ct. 927, 178 L. Ed. 2d 752 (2011), also cited by the majority, addresses a different issue not remotely raised by this case. There, the Sixth Circuit reviewed a District Court's denial of attorneys' fees under 42 U.S.C.A. § 1988 to a member of the Westboro Baptist Church. Id. at 595-96. The plaintiff had asserted an overbreadth challenge to a state law barring disturbances within three hundred feet of the site of a funeral or burial. Ibid. The District Court denied the fee application, reasoning that the plaintiff's proposed funeral

11

Rogers Grp., Inc. v. City of Fayetteville involved a due process and unconstitutional taking without just compensation challenge to an ordinance that placed limitations on the operations of rock quarries "near" the city limits, as well as within those limits, thus constituting an effort by the city to regulate activities outside of its boundaries. 683 F.3d 903, 904-05 (8th Cir. 2012). The constitutional challenge prompted the City of Fayetteville to repeal the portion of its ordinance that attempted to regulate rock quarries located beyond its borders. Id. at 906. The Eighth Circuit held that the plaintiff was a "prevailing party" for purposes of 42 U.S.C.A. § 1988, notwithstanding the City's abandonment of its defense of the challenged ordinance. Id. at 911-13.

The single case cited by the majority that addresses an election, Diffenderfer v. Gomez-Colon, 587 F.3d 445 (1st Cir. 2009), arose from circumstances very different from the setting of this case. There, the plaintiffs challenged the decision made by the State Election Commission of the Commonwealth of Puerto Rico that the ballots for the 2008 election in the Commonwealth -- including the elaborate instructions on how to

---

picketing would violate other provisions of Kentucky law that he declined to challenge. Id. at 596. The Sixth Circuit rejected that conclusion, noting that the District Court had improperly assumed that the plaintiff would violate unchallenged provisions of state law, and remanded the matter for a determination of whether the plaintiff was a "prevailing party" under 42 U.S.C.A. § 1988. Id. at 602-05.

12

use the "complex and difficult to understand" ballot -- would be printed in Spanish only. Diffenderfer v. Gomez-Colon, 587 F. Supp. 2d 338, 341-42, 349 (D.P.R. 2008). The District Court certified a class of Commonwealth residents who spoke only English, and held that Spanish-only ballots contravened the Voting Rights Act, the Equal Protection Clause and the First Amendment. Id. at 342, 345-50. The District Court later awarded counsel fees to the plaintiffs. Diffenderfer v. Gomez-Colon, 606 F. Supp. 2d 222, 230-31 (D.P.R. 2009).

While that award was on appeal, the Commonwealth's legislature enacted a statute mandating bilingual ballots. Diffenderfer, supra, 587 F.3d at 450. The First Circuit vacated the underlying judgment as moot, but affirmed the award of counsel fees. Id. at 451, 455. It held that the action by the legislature was "a circumstance not attributable to the Commission as an individual administrative entity." Id. at 452. It also noted that corrective legislation "is generally considered an intervening, independent event and not voluntary action, particularly when the governmental entity taking the appeal, as here, is not part of the legislative branch." Ibid. The First Circuit's reasoning is simply irrelevant to this case. Here, defendants took a defensible position on the procedure to be followed upon receipt of a defective Faulkner Act petition,

13

and plaintiffs achieved their objective in the following election.

In short, the majority cites no federal or New Jersey case law that suggests, let alone holds, that when a governmental authority asserts a viable legal position on an unsettled question of law, and that question is resolved in the plaintiff's favor in time for the plaintiff to exercise the disputed right, the defendant's action amounts to a deprivation. By the plain meaning of the term as it appears in N.J.S.A. 10:6-2(c), and in the many illustrations provided by case law construing its federal counterpart, a deprivation of the plaintiff's constitutional right is rooted in that plaintiff's loss of the ability to exercise that right.

In contrast to 42 U.S.C.A. § 1983, the NJCRA specifically addresses claims premised upon the defendant's interference or attempted interference with the plaintiff's "exercise or enjoyment of" his or her "substantive rights, privileges or immunities." N.J.S.A. 10:6-2(c). In my view, when a defendant has taken a position that requires a plaintiff to spend time, effort and resources in order to resolve a novel legal question, the defendant has -- at most -- interfered with or attempted to interfere with the plaintiff's rights. If, as the majority suggests, a plaintiff who successfully litigates a previously unsettled legal issue has been "deprived" of a right by virtue

14

of nothing more than the necessity of filing suit, I can discern no meaningful distinction between the provisions of the statute that address deprivation, on the one hand, and interference and attempted interference, on the other. If the Legislature had contemplated a statute that operates in the way that the majority construes it, it would not have limited the reach of the NJCRA as it did. It would have authorized an award of attorneys' fees to any plaintiff who has successfully litigated a dispute over an alleged governmental interference with a recognized legal right.

Instead, the Legislature carefully distinguished between an interference or attempted interference with a substantive right -- which warrants no NJCRA remedy unless achieved "by threats, intimidation or coercion" -- and a deprivation of such a right. N.J.S.A. 10:6-2(c); see Ramos v. Flowers, 429 N.J. Super. 13, 21 (App. Div. 2012). That is the line that the Legislature drew, and it should, in my view, be preserved.

I respectfully submit that the majority applies the NJCRA beyond its intended parameters when it construes a municipality's assertion of a good faith legal position in an area of unsettled law to be a deprivation of plaintiffs' civil rights within the meaning of N.J.S.A. 10:6-2(c). Accordingly, I would affirm the determination of the Appellate Division in its

15

entirety, and to the extent that the majority reverses that determination, I respectfully dissent.

JUSTICE LaVECCHIA joins in this opinion.

SUPREME COURT OF NEW JERSEY

NO.    A-13/14                    SEPTEMBER TERM 2013

ON CERTIFICATION TO _____ Appellate Division, Superior Court _____

DANIEL TUMPSON, RUSSELL
HOOVER, ERIC VOLPE, CHERYL
FALLICK and JOEL HORWITZ,

      Plaintiffs-Appellants
      and Cross-Respondents,

           v.

JAMES FARINA, in his capacity
as HOBOKEN CITY CLERK, and
THE CITY OF HOBOKEN,

      Defendants-Respondents
      and Cross-Appellants,

         and

MILE SQUARE TAXPAYER
ASSOCIATION 2009, INC., GINA
DENARDO, individually and on
behalf of all similarly situated
and 611-613, LLC, individually
and on behalf of all similarly situated,

      Intervenors-Respondents.

DECIDED _____ July 31, 2014 _____
         Chief Justice Rabner           PRESIDING
OPINION BY _____ Justice Albin _____
CONCURRING/DISSENTING OPINIONS BY _____ Justice Patterson _____
DISSENTING OPINION BY _____

| CHECKLIST | AFFIRM IN PART/ REVERSE IN PART/ REMAND | CONCUR IN PART/ DISSENT IN PART |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | | X |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | | X |
| JUSTICE FERNANDEZ-VINA | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | ---------------------- | ------------------- |
| TOTALS | 4 | 2 |

1