**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3472-21

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOSE Y. MARTINEZ-MEJIA[1],
a/k/a JOSE Y. MARTINEZ,
JOSE Y. MEJIA
and JOSE Y. YOBANI,

     Defendant-Appellant.

_____

Argued November 6, 2023 – Decided December 7, 2023

Before Judges Sabatino, Marczyk, and Chase.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Indictment No. 20-01-0028.

Samuel Clark Carrigan, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Samuel Clark Carrigan, of counsel and on the briefs).

---

[1]  Under Rule 1:38-3(c)(9), records of criminal proceedings relating to child victims of sexual assault are anonymized and excluded from public access in order to protect the identity of the victims.  As there was no actual child victim in this case, such anonymization is not necessary here.

Emily M. M. Pirro, Assistant Prosecutor, argued the cause for respondent (John P. McDonald, Somerset County Prosecutor, attorney; Emily M. M. Pirro, of counsel and on the brief).

The opinion of the court was delivered by

CHASE, J.S.C. (temporarily assigned).

The main issue in this criminal appeal is whether the Luring, Enticing Child by Various Means statute, N.J.S.A. 2C:13-6(a), requires the State to prove a defendant lured or enticed a "child," in this case an undercover law enforcement officer posing as a fourteen-year-old girl, into traveling or accompanying the defendant to some location other than the victim's own home.

We reject defendant Jose Y. Martinez-Mejia's contention that because he enticed the "child" to meet him alone, and defendant traveled to the "child's" home, a judgment of acquittal should have been entered. By its plain language, the statute forbids an adult from "luring or enticing a child to meet or appear at any other place." We hold that the child's home can be the "other place." Here, that location is a place "other" than where the defendant was when he communicated with the child.

In the unpublished portion of this opinion, we address unrelated arguments raised by defendant on appeal alleging evidentiary issues. Having found those arguments do not demonstrate plain error, we affirm defendant's convictions and sentence.

A-3472-21

2

The prosecution in this matter originated in October 2019 when a team of state, federal, and local law enforcement agencies participated in an undercover operation to investigate adults using the internet to lure children into sexual activity. Teams of officers were stationed in an apartment complex in Franklin Township, Somerset County.

Special Agent Cedro Cruz from the Department of Homeland Security served as a "chatter," posing as a fourteen-year-old girl named "Angela." Agent Cruz created a profile for Angela on SKOUT, a location-based social networking and dating application emphasizing generalized user location. Because of age restrictions on SKOUT, Angela's profile was created using a birthdate to reflect that she was eighteen-years old. Angela's profile picture and other pictures associated with her account were photographs of an adult female border patrol officer. Agent Cruz used age-regression software to alter the photographs, making Angela appear younger.

At a jury trial, Agent Cruz testified solely as a fact witness that on the afternoon of October 25, 2019, acting as Angela, he accepted a SKOUT chat request from defendant, who went by the username "James." Defendant was thirty-two years old at the time. Defendant's first messages were "Hi, sweetheart, how are you?" and "Hi, sweetheart, what are you doing?" When

A-3472-21

Angela replied with "nothing," he immediately followed up with, "[y]our pictures turn me on, honey. Where are you from?" When Agent Cruz testified about this first exchange with defendant, the following ensued:

> Q: On October 25[,] of 2019, why was the conversation only minutes?
>
> A: Because the defendant sent Angela a, I would say a lewd image, and I basically said gross and that discontinued the conversation.
>
> Q: And by lewd image what do you mean?
>
> A: So it was an image of a male in tight boxer shorts and you could see the contour of his – his penis.

Defendant contacted Angela again via SKOUT the next afternoon in an interaction that lasted approximately two hours. When defendant expressed a desire to meet Angela, the following exchange ensued:

> Angela: Yeah, but I'm mad young.
>
> Defendant: How old are you now?
>
> Angela: Fourteen. You?
>
> Defendant: Oh, I see, 23.
>
> Angela: Oh, okay, cool.
>
> Defendant: Yes, love, I like your body.
>
> Angela: Aw, thanks.
>
> Defendant: I would like to see more pictures from you.
>
> Angela: Why?
>
> Defendant: I like you.

During this exchange, and after Angela revealed her age, defendant sent Angela multiple photographs of himself, including a picture of his erect penis.

Angela revealed she was home alone because her grandmother had left and would not be returning until the next day. Defendant asked Angela explicit questions about sex and masturbation and said he wanted "more sexy pictures" of her. When Angela asked if he wanted only pictures, he responded, "I want to know you in person, baby." Defendant asked if Angela wanted to touch his body and told her he wanted to perform oral sex on her.

The prosecution admitted the photographs into evidence and published them for the jury. Agent Cruz was asked to "describe to the jury what they're seeing[.]" He replied, "The jury is seeing an image sent to Angela through SKOUT on October 26[,] of a hand holding an erect penis."

On re-direct, Agent Cruz testified as follows:

> Q:   During the course of those communications at any point in time did you threaten the defendant that he had to continue communicating with you?
>
> A:   No.   I was trying to dissuade him from communicating with me.
>
> . . . .
>
> Q:   How did you do that?
>
> A:   Well, I asked if he was a pic collector, and if he would have said yes, I am just a pic collector, then he would have just been a pic collector. I said that I—I was [fourteen] years old, I would hope after somebody

hears that, that they are communicating with a [fourteen]-year-old, they would then cease communications with that person. I said that I was alone, a fourteen-year-old alone in her house to which he asked me if there were any neighbors around and, you know, I lived with my grandmother and my grandmother was not home. That, any reasonable person, that's going to dissuade you and you are not going to travel. As a matter of fact, you might try to either report this person, which has happened in the past, but in this situation it didn't happen. And on top of that he sent a picture of his erect penis to a [fourteen]-year-old.

When defendant offered to come to Angela at 4:00 p.m. that day, she gave him the address of the apartment in Franklin and a phone number associated with Agent Cruz's undercover phone.

The communication then proceeded outside of SKOUT and directly between defendant and the undercover phone, which recorded every call and text message. Agent Cruz continued to send and reply to text messages; while Detective Katie Feehan from the New Jersey State Police Internet Crimes Against Children Unit ("ICACU") provided Angela's voice for phone calls.

Detective Feehan testified to her role with the ICACU and the training that she received in acting as a child in an undercover capacity; however, she was not tendered as an expert witness. She testified to the details of her three phone calls with defendant.

During the first phone call, defendant asked Angela to confirm that she was home alone. Angela told defendant her grandmother was in Atlantic City and would not be returning for a couple of days. Angela said her grandmother could not take her on the trip because she was not old enough to gamble. On a second phone call, Angela confirmed no one else was in the house by saying, "Just me and my grandma, and she isn't here. So I mean, I'm completely alone." On the third phone call, the following exchange ensued:

> [Angela]: . . . I'm just trying to figure out if you're coming up. Because, if not, I'm probably just gonna go out.
>
> [Defendant]: I mean, okay. So let me take a shower and then go – go over there.
>
> [Angela]: You gonna come?
>
> [Defendant]: Yes.
>
> [Angela]: Okay. Awesome. I'm gonna clean up a little bit then.

When Angela asked defendant what he wanted to do when he arrived, he repeated his desire to perform oral sex on her. She reaffirmed she was going to clean the apartment to prepare for his arrival, and then she was going to wait for him.

Defendant hired an Uber to take him to Franklin and sent Angela a screen shot of his phone's Uber application, showing that he was on his way to her house. When defendant texted Angela that he had arrived, Agent Cruz could

see him standing outside through the apartment window. Defendant was arrested and was found to be in possession of a cell phone, a receipt with Angela's address written on it, $184 dollars, and two condoms.

At trial, Detective Feehan was asked on cross-examination about her training on the topic of entrapment. Detective Feehan testified that she had reviewed the relevant New Jersey law and that it closely matched the national standard. She testified that she had been trained to allow the subject of the investigation "to set the tone, pace, and subject matter of the conversation[.]" She was presented with a portion of the investigative standards from the ICACU, which was entered into evidence.

On re-direct, the following exchange took place:

> Q: On cross-examination you were asked some questions about your training with regard to the topic of entrapment. Do you recall that?
>
> A: Yes.
>
> Q: And you testified that you received training about the federal and also State of New Jersey entrapment laws. Is that correct?
>
> A: Yes.
>
> Q: Did you follow the entrapment laws in this case?
>
> A: Yes.

Defense counsel re-crossed Detective Feehan on those points, asking whether "[w]hat do you wanna do when you get here?" was a conversation topic that defendant initiated, to which she replied in the negative.

During an extensive charge conference, defense counsel raised no objections to the language of the second-degree luring charge. The jury was instructed that a guilty verdict on luring required the State to prove:

> 1. That "Angela" was a child. When I say Angela I have that in quotes, or, that the defendant reasonably believed that Angela was a child.
>
> 2. Defendant—that defendant attempted to lure or entice Angela into a motor vehicle, structure or isolated area, to meet or appear at any other place; and,
>
> 3. That defendant had a purpose to commit a criminal offense with or against the child.

The jury returned a verdict finding defendant guilty of all charges: second-degree luring, N.J.S.A. 2C:13-6(a); second-degree attempted sexual assault, N.J.S.A. 2C:5-1(a)(3) and 2C:14-2(c)(4); third-degree attempted endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1), 2C:5-1(a)(1) and (a)(3); and third-degree attempted promoting obscene material to a minor, N.J.S.A. 2C:34-3(b)(1), 2C:5-1(a)(1) and (a)(3).

After merging the attempted endangering the welfare of a child count with the attempted sexual assault count, the judge sentenced defendant concurrently to five years of imprisonment on the attempted sexual assault charge; five years

on the luring charge; and three years on the attempted obscene material charge. Defendant was also subjected to Megan's Law registration requirements and parole supervision for life.

On appeal, defendant raises the following claims for the first time:

    I.    THE LURING CHARGE MUST BE VACATED BECAUSE DEFENDANT DID NOT TRY TO LURE A CHILD INTO GOING ANYWHERE.

    II.    THE DEFENDANT'S CONVICTIONS SHOULD BE REVERSED BECAUSE INADMISSIBLE LAY OPINION TESTIMONY FROM INVESTIGATING OFFICERS INTRODUCED UNFAIR PREJUDICE.

## II.

When a party does not object to an alleged trial error, or otherwise preserve the issue for the appellate record, it is reviewed for plain error. Review for plain error requires determining: "(1) whether there was error; and (2) whether that error was 'clearly capable of producing an unjust result,' [under Rule] 2:10-2; that is, whether there is 'a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Dunbrack, 245 N.J. 531, 544 (2021) (quoting State v. Funderburg, 225 N.J. 66, 79 (2016) (omission in original)). "To determine whether an alleged error rises to the level of plain error, it 'must be evaluated in light of the overall strength of the State's case.'" State v. Clark, 251 N.J. 266, 287 (2022) (quoting State v.

Sanchez-Medina, 231 N.J. 452, 468 (2018)). "The mere possibility of an unjust result is not enough." Funderberg, 225 N.J. at 79. Where there is a failure to object, reviewing courts presume the newly minted objection on appeal is "not error" and "unlikely to prejudice the defendant's case." State v. Singleton, 211 N.J. 157, 182 (2012) (citing State v. Macon, 57 N.J. 325, 333-34, (1971)).

Statutory interpretations are legal determinations reviewed by an appellate court "de novo, 'unconstrained by deference to the decisions of the trial court[.]'" State v. Fuqua, 234 N.J. 583, 591 (2018) (quoting State v. S.B., 230 N.J. 62, 67 (2017)). A trial court's evidentiary rulings, by contrast, are reviewed for abuse of discretion. State v. Garcia, 245 N.J. 412, 430 (2021) (citing State v. Nantambu, 221 N.J. 390, 402 (2015)). An appellate court "will not substitute [its] judgment unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" Ibid. (quoting State v. Medina, 242 N.J. 397, 412 (2020)).

### III.

Defendant does not claim the indictment should have been dismissed, nor does he explicitly express that the trial court, sua sponte, should have found that the State had not met the elements of the crime at the close of its case. Rather, defendant's issue seems to be a conceptual one, where he believes we should hold: (1) telling a child you want to meet for sex; (2) asking them to meet you

to fulfill that desire; and (3) making sure a child is alone and vulnerable before meeting them, is not luring or enticing the child into a sexual encounter so long as the child makes the mistake of meeting the would-be predator at the child's own house.

Defendant emphasizes that the forbidden conduct element of the statute is "to lure or entice" a child to go somewhere. Relying on the dictionary definition of "lure," defendant argues its aim is "to lead someone into a dangerous or difficult situation that they otherwise would not have entered." Merriam-Webster's Collegiate Dictionary, (11th ed. 2020). Therefore, defendant reasons, the statute does not criminalize traveling to the child for the criminal purpose. Defendant concedes a child may be "lured" into staying at a place that they otherwise would have left, such as a school after-hours, but argues if a child would be at home or school anyway, even without the defendant's enticement, then luring has not taken place.

Defendant argues, in the alternative, that even if the statutory language was not clear, the only provision that could be considered ambiguous is the term "to meet or appear at any other place." Defendant employs the canon of ejusdem generis to argue that the phrase "any other place" must also refer to places where a child must be lured to travel towards for the statutory elements to be met. Defendant points to the luring statute's close relationship to the kidnapping

statute, N.J.S.A. 2C:13-6(c), to support his theory.  Defendant argues even if the statutory language did not support his position, the principle of lenity should apply in favor of interpreting the statute to require the child to be lured to travel.

The State responds that defendant is asking us to create a "convenient loophole" in the statutory scheme by finding that an adult traveling to a child's location for the purpose of sex is not criminalized by the luring statute.  The State maintains that a complicated analysis of the text under ejusdem generis is not required since the clause "to meet or appear at any other place" is unambiguous on its face.

The "ordinary meaning and significance" of statutory language is acknowledged as "'the best indicator of [the Legislature's] intent.'"  Tumpson v. Farina, 218 N.J. 450, 467 (2014) (alteration in original) (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)).  Only where the statutory language at issue is ambiguous should a court "look to extrinsic evidence, such as legislative history [and] committee reports" to determine legislative intent.  Tumpson, 218 N.J. at 468.  Where the textual analysis and extrinsic aids both fail to resolve ambiguity, the rule of lenity "requires that the ambiguity be resolved in favor of the defendant."  State v. Regis, 208 N.J. 439, 451 (2011).  Courts should "avoid statutory interpretations that 'lead to absurd or unreasonable results.'"  State v. Lewis, 185 N.J. 363, 369 (2005) (quoting State v. Gill, 47 N.J. 441, 444 (1966)).

The plain language of the statutory text in question provides in relevant part:

> A person commits a crime of the second degree if he attempts, via electronic or any other means, <u>to lure or entice </u>a child or <u>one who he reasonably believes to be a child</u> into a motor vehicle, structure or isolated area, or <u>to meet or appear at any other place</u>, with a purpose to commit a criminal offense with or against the child.
>
> [N.J.S.A. 2C:13-6(a) (emphasis added).]

One must look at the wording of the entire phrase in its context, which prohibits to "lure or entice," and the entire dictionary definition of both words to determine the statute's ordinary meaning. Defendant's argument only focuses on the dictionary definition of "lure" to conclude that "to lead someone into a dangerous or difficult <u>situation</u> that they otherwise would not have entered" means to go to another location. The definition of "lure" includes "to lead astray from one's true course." <u>Merriam-Webster's College Dictionary</u>, (11th ed. 2020). And "entice" is defined as "to lure or induce; esp., to wrongfully solicit (a person) to do something." <u>Black's Law Dictionary</u> (11th ed. 2019). The prohibited conduct is thus defined by its aim to lead someone into a dangerous or difficult situation that they otherwise would not have entered. The course of action Angela was lured into was staying alone, isolated, and vulnerable to meet an adult male for an illegal sexual encounter.

Here, the ordinary meaning of the phrase "to meet or appear at any other place" also leads to the conclusion defendant engaged in prohibited conduct when he enticed Angela to stay at her home and not go out with her friends. There is no reason to construe the phrase of "any other place" as containing an unwritten exception for places where the child is already located. Here, that location is a place "other" than where the defendant was when he communicated with the child. Defendant went through great pains to ensure Angela would be alone before telling her he was coming over. Indeed, by requesting the child to stay at her home, the abuse is all the easier to commit; since it lulls the child into a false sense of security; creating the dangerous circumstance of isolation and vulnerability that this statute is meant to punish. Neither the dictionary definitions nor the language of the statute expresses a requirement of the victim going to a different place.

Although there is no need to make any further inquiry, our decision is also supported by the legislative history, which suggests an intent to create an expansive scheme to criminalize an increasing number of dangerous behaviors. The original text, now thirty years old, was limited to luring a child into a motor vehicle. By contrast, the current statute criminalizes two actions (luring and enticing), by unlimited means (electronic or any other), with two categories of victims (children or those reasonably believed to be children), a wide number of

prohibited enticements (motor vehicles, structures, isolated areas, and meetings or appearances at any other place), and a broadly stated purpose element (to commit a criminal offense with or against the child).

In addition, analyzing this statute in relation to our kidnapping statute, N.J.S.A. 2C:13-1, also undermines defendant's position. The kidnapping statute was meant to address the kind of danger isolation poses to a child, and such isolation and danger can certainly be present at the child's own home, especially where, as here, the child is confirmed to be home alone. See State v. Cruz-Pena, 243 N.J. 342, 354-61 (2020) (kidnapping occurs when the victim is confined to one place for a substantial period, citing to a litany of cases where kidnapping-by-confinement occurs in places where the victim would still otherwise be); State v. LaFrance, 117 N.J. 583, 592-93 (1990) (confining a victim to his own bedroom for a substantial period in order to isolate the man's wife and sexually assault her constituted kidnapping).

Defendant's request that the principle of lenity support an interpretation in his favor is similarly unavailing, and is not required, given the unambiguous text and expansive legislative history. The fact that other statutes such as the child endangerment statute, N.J.S.A. 2C:24-4, might also criminalize a defendant's behavior does not compel us to adopt a crabbed interpretation of N.J.S.A. 2C:13-6(a).

A-3472-21

IV.

The remaining arguments presented by defendant warrant no more than a brief discussion.

A.

Lay witnesses may testify "in the form of opinions or inferences if [the testimony]: (a) is rationally based on the witness's perception; and (b) will assist in understanding the witness's testimony or determining a fact in issue." N.J.R.E. 701. Perception "rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell, or hearing." State v. McLean, 205 N.J. 439, 457 (2011) (citations omitted). Lay opinion testimony is impermissible when it constitutes "an expression of a belief in defendant's guilt" or "an opinion on matters that were not beyond the understanding of the jury." Id. at 463. Lay witnesses may not opine on a matter "as to which the jury is as competent as [the witness] to form a conclusion[.]" Id. at 459 (second alteration in original) (quoting Brindley v. Firemen's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955)). So long as the lay witness opinion is competent under N.J.R.E. 701, and is not otherwise inadmissible, it will not be objectionable simply because it "embraces an ultimate issue to be decided by the trier of fact." N.J.R.E. 704. See Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. on N.J.R.E. 704 (2023) ("[O]pinion testimony is not inadmissible solely because it includes the

ultimate issue in question. If lay or expert opinion testimony is otherwise competent under N.J.R.E. 701, 702 and 703, the fact that it may embrace the ultimate fact issue in dispute does not render it incompetent.").

Fact testimony, by contrast, is "ordinary fact-based recitation by a witness with first-hand knowledge." McLean, 205 N.J. at 460. For a police officer, in the context of a narcotics trial, such fact testimony may include:

> a description of what the officer did and saw, . . . that defendant stood on a corner, engaged in a brief conversation, looked around, reached into a bag, handed another person an item, accepted paper currency in exchange, threw the bag aside as the officer approached, and that the officer found drugs in the bag.

Ibid.

In McLean, our Supreme Court cautioned against admitting lay opinion testimony by a police officer where the opinion is based on the officer's training and experience, writing "the analysis of admissibility has been, as it must be, firmly rooted in the personal observations and perceptions of the lay witness in the traditional meaning of the Rule 701." 205 N.J. at 459. The McLean Court considered the admissibility of a police officer's testimony in which he first recounted his observations of an interaction between two individuals and then testified as to his own belief, based on his experience, that what he had observed was a hand-to-hand drug transaction. Id. at 446.

The McLean Court found the second part of the officer's testimony inadmissible because the police officer had not been qualified as an expert and because the lay opinion rule could not provide a basis for admissibility. Id. at 463. The Court held such testimony "was impermissible both because it was an expression of a belief in defendant's guilt and because it presumed to give an opinion on matters that were not beyond the understanding of the jury." Ibid.

B.

Defendant argues testimony given by Detective Feehan included inadmissible lay opinions with "zero probative" value, which introduced such an unfair prejudice that a new trial is required. Specifically, defendant argues Detective Feehan should not have been permitted to testify that she followed the laws on entrapment. Defendant argues the entrapment statute requires the issue to be settled by the factfinder. The State, meanwhile, contends the testimony was proper.

This testimony from Detective Feehan was offered on re-direct examination, after detailed cross-examination squarely placed entrapment at issue. Here, Detective Feehan's testimony was like that of the hypothetical narcotics officer described in McLean. It was a factual recitation of her own actions during the operation, namely that she followed protocol, not an opinion about anything defendant did or did not do. The jury was free to find her

19

statements credible or not. Detective Feehan was not asked for, and did not offer, her thoughts or beliefs as to defendant's guilt or innocence. She only recounted the actions she took that day.

Even to the extent that Detective Feehan's testimony could be considered a lay opinion on entrapment, such an opinion is not inadmissible simply because it goes to an issue to be decided by the factfinder. It must be incompetent under N.J.R.E. 701 or inadmissible on other grounds. The only argument defendant advances on this point is that the statement had "zero probative value," possibly an attempt to disqualify the statements under N.J.R.E. 701(b) or N.J.R.E. 401. This position is untenable, given that entrapment and Detective Feehan's training on the same were extensively explored in cross-examination by defense counsel.

Detective Feehan's one-word answer of "yes" to the question, viewed in light of the overall evidence against defendant, was not "clearly capable" of producing an unjust result. R. 2:10-2. It was evidence to be weighed by the jury under a preponderance standard if and only if they found guilt had been established.

C.

Defendant maintains Agent Cruz's description of the photograph sent on October 25 as "a lewd image" and pointing out the contour of the penis was unnecessary and impermissibly purported to usurp the role of the jury. The State

believes the testimony was proper because Agent Cruz's description was rationally based on his own perception, as required by N.J.R.E. 701(a).

Agent Cruz's testimony that defendant "sent a picture of [an] erect penis to a [fourteen-year-old]," his characterization of the photograph as a "lewd image," and his description of the displayed photograph indicating the "contour of the penis" are opinion testimony only to the extent that they reflect Agent Cruz's beliefs about the images displayed for the jury. Our Court recently took up the admissibility of lay witness testimony providing subjective interpretations of a video recording in State v. Watson, 254 N.J. 558 (2023). There, the Court held:

> A fact witness who participated in an event can of course testify about it and recount relevant evidence without resort to Rule 701. Rule 701, in its purest form, allows witnesses to offer lay opinion testimony based on their firsthand observation of events in real time. Beyond that, they can offer lay opinion testimony about parts of a recording that depict what they perceived in real time. In those instances, they plainly have sufficient personal knowledge within the meaning of Rules 602 and 701.
>
> [Id. at 599.]

The Watson Court also addressed the helpfulness prong of N.J.R.E. 701(b), holding the analysis is "more straightforward and depends on the facts of the individual case." Id. at 600. In contrast, in State v. Higgs the Court disallowed narration evidence by a police officer who was not present on the

scene because "[t]he jury was as competent as the detective to view the video and determine what the image did or did not show." 253 N.J. 333, 336 (2023). Higgs is distinguishable from this case because Agent Cruz personally participated in the chat to which he was testifying.

Applying this same analysis to the photos before Agent Cruz, it is clear he was permitted to testify as to his firsthand observations of the photographs. To the extent his testimony included any subjective interpretation of the photographs, it would still be an admissible lay opinion since he personally participated in the chat and therefore, under Watson, "plainly [has] sufficient personal knowledge" to satisfy N.J.R.E. 701(a). 254 N.J. at 599. And Agent Cruz's testimony was helpful to the jury under N.J.R.E. 701(b) because this testimony was offered to explain his interactions with defendant.

Defendant posits Agent Cruz's testimony was inadmissible because by stating that "any reasonable person" would not continue chatting with someone who revealed themselves to be a fourteen-year-old, and by stating "you are not going to travel" after learning of the child's age, Cruz impermissibly opined on defendant's guilt. This opinion, according to defendant, impermissibly invaded the province of the jury by embracing an ultimate issue.

Agent Cruz's testimony constitutes opinion testimony in that it is not a factual recitation of actions taken or observations made during the operation,

but rather a subjective characterization of what defendant or others in defendant's position might do. Therefore, to be admissible, the statement must satisfy both the perception and helpfulness prongs of N.J.R.E. 701, and it must not constitute expression of a belief about defendant's guilt or innocence.

Here, Agent Cruz's testimony about the behavior of "any reasonable person" and that such a person is "not going to travel" after learning of Angela's age is more like the precluded evidence in McLean, in that it is a subjective lay opinion of defendant's behavior, based on Agent Cruz's training and experience in performing these types of operations in the past. These statements were inadmissible lay opinions, and it was error for them to be admitted.

However, considering the brevity of these comments compared to Agent Cruz's overall testimony, the error does not rise to the level of being clearly capable of producing an unjust result and was not plain error, given the overall strength of the State's case and the clear evidence of defendant's continued sexually explicit conversation with Angela after being told her age.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3472-21

23